UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CIV 5217

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BA CHUB CAY, LLC,

                    Plaintiff,

    -against-

WALTER J. MCCRORY, BOB L. MOSS and KAYE
PEARSON,

                    Defendants.

Case No.

**COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff, BA Chub Cay, LLC ("Lender"), by its attorneys Katten Muchin Rosenman LLP, as and for its Complaint against defendants, Walter J. McCrory, Bob L. Moss and Kaye Pearson (each a "Guarantor," and collectively, the "Guarantors" or "Defendants"), alleges as follows.

### Nature of the Action

1.      This is an action to enforce the obligations of Defendants, as Guarantors, under a Loan and Security Agreement executed by them on or about May 10, 2007 (the "Loan Agreement"). As amplified below, the Loan Agreement included Guarantors' irrevocable and absolute guarantees ("Guarantees") of, *inter alia*, the repayment of a $16,000,000 loan made by Lender to entities of which Guarantors are principals, as well as other obligations in connection with the construction of a vacation home/marina development on Chub Cay in the Commonwealth of the Bahamas (the "Development"). Lender has notified Guarantors in writing of their continuing defaults, but these defaults remain uncured. As a result of Guarantors' continuing defaults under the Loan Documents (defined below), there is due and owing to Lender, as of June 2, 2008, the sum of $18,764,150.39 (exclusive of attorneys' fees), none of

which has been repaid. Lender seeks a declaration that Guarantors are in default and in breach of their obligations under the Loan Documents and are jointly and severally liable for Lender's damages resulting therefrom.

## The Parties

2.    Plaintiff Lender is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 299 Park Avenue, New York, New York 10171. None of Lender's members is a citizen of the State of Florida.

3.    Defendant Walter J. McCrory is an individual who is a citizen of the State of Florida and has an office at c/o Chub International, L.C., 1510 S.E. 17th Street, Suite 400A, Fort Lauderdale, Florida 33316.

4.    Defendant Bob L. Moss is an individual who is a citizen of the State of Florida and has an office at c/o Chub International, L.C., 1510 S.E. 17th Street, Suite 400A, Fort Lauderdale, Florida 33316.

5.    Defendant Kaye Pearson is an individual who is a citizen of the State of Florida and has an office at c/o Chub International, L.C., 1510 S.E. 17th Street, Suite 400A, Fort Lauderdale, Florida 33316.

## Jurisdiction and Venue

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

7.    In the Loan Agreement, the parties irrevocably and unconditionally consented to personal jurisdiction in any state or federal court in New York City in any action arising out of or

relating to the loan agreement and waived any objection to the venue and the defense of an inconvenient forum in any such court.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Venue also is proper in this District because Defendants have contractually agreed to the laying of venue in any New York state or federal court and waived any claim or defense of an inconvenient forum.

## Factual Background

9.     On or about May 10, 2007, Lender, Guarantors and two entities of which Guarantors are principals, Chub Cay Club Associates LTD and Chub Cay Resorts LTD (both Chub Cay entities collectively are referred to herein as the "Borrower"), executed the Loan Agreement (a copy of which is attached as Exhibit A), of which the Guarantees are a part, as well as related documents including, among others, a promissory note (the "Note," a copy of which is attached as Exhibit B) (the Loan Agreement, the Guarantees therein and the Note, collectively are referred to herein as the "Loan Documents").  Under the Loan Agreement, Lender agreed to make, and Borrower agreed to borrow,  a loan in the original principal amount of $16,000,000 (the "Loan") to be used in connection with the Development.  The Loan is secured by, among other things, a second mortgage encumbering the real property on which the Development is located (the real property with its improvements is the "Property").

## The Loan Documents

10.     In the Note, which is in the amount of $16,000,000, Borrower agreed to pay interest on the unpaid principal amount outstanding until maturity (whether by acceleration or otherwise), as specified in the Loan Agreement and that all amounts due would be payable without setoff, counterclaim or any other deduction whatsoever.  Borrower also agreed to pay all

reasonable costs and charges incurred by Lender in the collection or enforcement of the Note, including, reasonable attorneys' fees and court costs (Exhibit B).

11.     Under the Loan Agreement, Lender, in reliance upon the representations of Borrower and Guarantors, among others, agreed to make the Loan to Borrower (Exhibit A, Section 2.1(a)).  The Loan Agreement provides for a term of three years unless the Loan is accelerated (Exhibit A, page 10).  Pursuant to the Loan Agreement, Lender made advances in the amount of $16,000,000 to, or for the benefit of, Borrower.

12.     The Loan Agreement provides for an annual interest rate of 18.5% (Section 2.4(a) and page 8) and, upon the occurrence of an Event of Default, for an annual rate of the lesser of the maximum rate permitted by law or 23.5% (Section 2.4(b)).

13.     The Loan Agreement also provides for a late charge on any amount of interest overdue for a period in excess of 10 days in the amount of 5% of the overdue amount (Section 2.8), and further provides for an "Exit Fee" due upon payment of the Loan, the amount of which Fee depends upon when the Loan is repaid (page 7).

14.     Amongst the many obligations incurred by Borrower under the Loan Agreement, Borrower covenanted, *inter alia,*

(a)     to pay all taxes, assessments, claims, and governmental charges levied upon the Property or itself before they become delinquent (Section 7.1(a));

(b)     to provide, maintain and keep in force insurance polices with respect to the Property and itself with Lender as an additional named insured on all coverage (Section 7.1(e));

(c)     to perform in all material respects its obligations under, and enforce all monetary and other material terms of, any "Material Contracts" (as that term is defined in the

4

Loan Agreement), including construction and building contracts with respect to the Property, and deliver to Lender copies of any notices received or sent by any party under any material contract (Section 7.1(f)); and

(d)    to comply, in all material respects, with the terms and conditions of any other "permitted debt," including, among others, credit facilities in a maximum principal amount of $45,000,000 from ScotiaBank (Bahamas) Limited (the "Senior Debt") and debt in the amount of more than $6,000,000 owed to Caterpillar Financial Services Corporation (the "Caterpillar Debt"), and deliver to Lender copies of notices received or sent by any party with respect to or under any permitted debt (Section 7.1(g));

15.    With respect to the construction of the Development, Borrower covenanted to:

(a)    provide Lender with sufficient information to enable it to monitor the monthly reports delivered by Borrower to the holder of the Senior Debt (Section 7.1(n)(4));

(b)    notify Lender as soon as practicable after it became apparent that work on approved infrastructure improvements would not be achieved by the date contemplated in the building contracts and notify Lender of the reason for such delay (Section 7.1(n)(5));

(c)    submit to Lender all master plans and specifications required to carry out the approved infrastructure improvements and such other plans and specifications reasonably required for Lender's approval (Section 7.1(n)(6));

(d)    provide all financial and other information and assistance which Lender may reasonably require to permit it to review and report on the progress of the approved infrastructure improvements, including providing full and free access at all reasonable times to: (a) the Property and all buildings erected or being erected thereon; and (b) all plans, specifications and estimates of materials and services required, time and completion schedules

and estimates of costs, and all approvals and certificates of and correspondence with any governmental or local authority in connection with the approved infrastructure improvements or otherwise and supplying copies thereof as required by Lender(Section 7.1(n)(7)); and

(e)     comply in all material respects with each building contract and notify Lender in writing forthwith of any material breach or event which with the giving of notice or lapse of time or both would constitute a material breach of any contract (Section 7.1(n)(8)).

16.     Borrower also covenanted in the Loan Agreement, for as long as any portion of the Loan remained unpaid, not to create or incur or to cause or permit any Guarantor to create or incur any debt other than debt permitted under the Loan Agreement (Section 7.2(a)).

17.     The Loan Agreement also confers numerous reporting requirements upon Borrower including, *inter alia*,

(a)     that within five days after obtaining knowledge of the occurrence of any default under the Loan Documents, the documents relating to the Senior Debt, any "Material Contract" (as that term is defined in the Loan Agreement) or the development or occurrence of any event reasonably likely to have a "Material Adverse Effect" (as that term is defined in the Loan Agreement), the provision of a statement setting forth the details of the default, event, development or occurrence and the actions that Borrower or Guarantors had taken and proposed to take with respect thereto (Section 7.3(a));

(b)     the provision of prompt notice of the commencement of any lawsuit against Borrower (Section 7.3(e));

(c)     as soon as available, and, in any event, within forty-five days after the end of each quarter, the provision of specified financial statements to Lender (Section 7.3(c)) and

within 120 days after the end of each fiscal year, the provision of annual financial statements (Section 7.3(d)); and

      (d)    the provision of such other information respecting Borrower's business condition, operations, performance, properties or prospects as Lender may reasonably request (Section 7.3(g)).

    18.    With respect to the Senior Debt, Borrower covenanted in the Loan Agreement fully to keep, perform and comply with each of the covenants in the documents relating to the Senior Debt, which were incorporated by reference into the Loan Agreement (Section 7.5).

    19.    Among other things, the Loan Agreement provides that, if any of the following events should occur and be continuing, they are "Events of Default":

      (a)    The failure to pay any principal of the Loan when due, the failure to pay any interest on the Loan within five business days after it is due or the failure to make any other payment due within five business days after notice from Lender of such failure (Section 8.1(a));

      (b)    The failure of Borrower to keep in full force and effect the required policies of insurance (Section 8.1(e));

      (c)    The failure of Borrower or Guarantors to perform any other term, covenant or agreement contained in any loan document within thirty days after written notice to Borrower (Section 8.1(f));

      (d)    The occurrence of an event of default with respect to the Senior Debt and the failure to cure it within any applicable cure period (Section 8.1(m));

      (e)    The occurrence of an event of default with respect to any permitted debt, including the Caterpillar Debt, in the amount of $100,000 or more not cured within any applicable cure period (Section 8.1(m)); and

(f)    The breach of any financial covenant of Guarantors for ten days after notice of such breach (Section 8.1(n)).

20.    Upon the occurrence of any Event of Default, Lender has the right to declare immediately due and payable, without further notice, protest, presentment, notice of protest or demand, all amounts advanced pursuant to the Note and the Loan Agreement together with all accrued interest, including interest at the default rate, and any exit fee or other charge owed as a result of the acceleration (Section 8.2(a)).

21.    Additionally, upon any Event of Default under the documents concerning the Senior Debt, Lender has the immediate right, without prior notice to Borrower, but no obligation, (i) to pay all or any part of the Senior Debt and any other sums that are then due and payable, and to take any action on behalf of Borrower to cause all the terms, covenants and conditions of the Senior Debt to be performed.  All sums, if any, so paid and costs and expenses, if any, incurred by Lender in exercising such rights (including reasonable attorneys' fees) (i) will constitute additional advances of the Loan to Borrower, (ii) will increase the unpaid principal amount of the Loan, (iii) will bear interest at the default rate and (iv) will constitute obligations under the Loan Agreement (Section 7.6 (a)).

22.    The Loan Agreement provides that all of the remedies given to Lender in the Loan Documents or otherwise available at law or in equity to Lender are cumulative and may be exercised separately, successively or concurrently and that Lender's failure to exercise any one of the remedies will not constitute a waiver by Lender nor will the use of any such remedy prevent the subsequent or concurrent resort to any other remedy or remedies vested in Lender by the loan documents or at law or in equity (Section 8.3).

23.    Borrower also agreed to pay on demand from and after a default, all costs and expenses of Lender in connection with the enforcement of the Loan Documents in any action, suit or litigation, including the reasonable fees and expenses of counsel for Lender (Section 10.4(a)).

## The Guarantees

24.    Article XI of the Loan Agreement contains the "joint[] ... several[] irrevocabl[e] and unconditional[]" Guarantees, pursuant to which Guarantors, among other things,

(a)    guaranteed to Lender Borrower's "due and punctual observance and performance of all the terms, conditions and covenants . . .contained in the Loan Agreement" and, following an Event of Default, agreed to pay to Lender on demand any and every sum of money due which Borrower shall at any time be liable to pay to Lender under or pursuant to the Loan Agreement (Section 11.1(i)); and

(b)    agreed as a primary obligation to indemnify Lender on demand from and against any loss incurred by Lender as a result of any of the obligations of Borrower becoming void, unenforceable or ineffective as against Borrower for any reason whatsoever, the amount of such loss being the amount which the person or persons suffering it would otherwise have been entitled to recover from Borrower (Section 11.1(ii)).

25.    The Guarantees are guarantees of payment as Guarantors agreed that Lender is not obligated to (a) make any demand of Borrower; (b) take any action or obtain a judgment against Borrower; (c) make or file any claim or proof against Borrower; or (d) enforce or seek to enforce any other security of Borrower before exercising its rights against Guarantors (Section 11.6).

26.   Additionally, Guarantors agreed that the "Guaranteed Obligations" (as that term is defined in the Guarantees) would constitute and be continuing obligations notwithstanding any settlement of account or other matter or thing whatsoever and in particular would not be considered satisfied by any intermediate payment or satisfaction of all or any of the obligations of Borrower under the Loan Agreement and would continue in full force and effect until final payment of all amounts owed by Borrower under the Loan Agreement and total satisfaction of all Borrower's obligations under the Loan Agreement (Section 11.3). In addition, the Guarantees provide that neither the Guaranteed Obligations nor the rights, powers and remedies conferred in respect of Guarantors upon Lender by the Loan Agreement or by law will be discharged, impaired or otherwise affected by any act, event or omission which might otherwise discharge, impair or otherwise affect any of the obligations of Guarantors or any of the rights, powers or remedies conferred upon Lender by the Loan Agreement or by law (Section 11.4).

27.   Further, Guarantors agreed to pay on demand, any and all expenses, including attorneys' fees incurred by Lender in the enforcement, obtaining advice of counsel with respect to, or collection of, any or all of Guarantors' obligations under the Guarantees (Section 11.1(c)).

## The Defaults

a.   Borrower's Defaults

28.   In or about early 2008, Lender was advised that Borrower had failed to (i) pay debt service due with respect to the Senior Debt and (ii) maintain the required insurance and real estate taxes coverage required by both the Senior Debt and the Loan Agreement. These failures are Events of Default under the Loan Agreement. Borrower failed promptly to notify Lender of these Events of Default as required by the Loan Agreement,

29.     Additionally, Lender has learned that Borrower is in material breach of many of the construction and building contracts in violation of the Loan Agreement and has repeatedly failed to notify Lender of the material breaches and the institution or threatened institution of proceedings against Borrower and or Guarantors by trade creditors of Borrower as required by the Loan Agreement.

30.     For example, it was not until Lender learned, from another source, that an action had been filed against Guarantors with respect to the Caterpillar Debt that Lender became aware that Borrower and Guarantors had defaulted in payment of that debt and that more than $14,000,000 was then owed by Borrower and Guarantors in respect of the Caterpillar Debt.

31.     Further, despite numerous requests from Lender, Borrower has continually failed to provide any meaningful financial statements that conform with the requirements of the Loan Agreement.

32.     All of the uncured defaults in payment, the failures to notify Lender of the defaults, the failures to notify Lender immediately of lawsuits or threatened lawsuits and the failures to provide the required financial statements are Events of Default under the Loan Agreement.

b.     Guarantors' Defaults

33.     Guarantors have failed in their obligation under the Guarantees to ensure Borrower's due and punctual performance of all of Borrower's obligations under the Loan Agreement.

34.     Moreover, Guarantors have failed to maintain the minimum net worth and aggregate liquidity required by the Loan Agreement and to furnish required financial information.

35.    These failures are defaults under both the Loan Agreement and the Guarantees.

### Lender's Notices of the Defaults

36.    On or about February 20, 2008, Lender notified Borrower and Guarantors of Borrower's default in providing information and documentation required by Sections 7.1 and 7.3 of the Loan Agreement (a copy of the notice of default is attached as Exhibit C).

37.    In a separate notice sent to Guarantors, Lender set out their defaults in failing to maintain the net worth and liquidity required by Section 7.4 of the Loan Agreement and to provide the financial statements necessary to show that they have done so required by Section 7.3(g) (a copy of this notice of default is attached as Exhibit D).

38.    Despite these notices from Lender, Borrower and Guarantors have not cured the defaults.

### Lender's Election to Accelerate the Debt

39.    On or about June 2, 2008, Lender sent to Borrower and Guarantors a notice of its election to accelerate the indebtedness under the Loan Agreement due to the uncured Events of Default of which Lender had previously given notice and additional Events of Default of which Lender had become aware.  A copy of Lender's June 2 notice to Borrower is attached hereto as Exhibit E.  Among other things, Lender gave notice of:

(a)    Borrower's failure to pay debt service with respect to Senior Debt as required by Sections 7.1(f) and 7.5 of the Loan Agreement;

(b)    Borrower's failure to maintain the required insurance coverage set forth in the documents relating to the Senior Debt and the Loan Agreement as required by Sections 7.1(e) and (f) of the Loan Agreement;

(c)    Borrower's failure to pay real estate taxes and assessments levied against the Property as required by Sections 7.1(a) and (f) of the Loan Agreement;

(d)    Borrower's failure to notify Lender of material breaches under building contracts, including the institution or threatened institution of proceedings against Borrower and/or Guarantors by trade creditors of Borrower in breach of Section 7.1(n) of the Loan Agreement;

(e)    Borrower's failure to notify Lender of Borrower's default with respect to the Caterpillar Debt in violation of Sections 7.1(f), (g) and (n) of the Loan Agreement;

(f)    Borrower's failure to provide notice of defaults under the Loan Agreement, including the willful incurring of additional prohibited indebtedness by Borrower and Guarantors, the failure to pay debt service with respect to the Senior Debt and the failure to provide any statement setting out the details of the defaults or the actions which Borrower proposes to take with respect to the defaults as required by Section 7.3(a) of the Loan Agreement;

(g)    Borrower's failure, despite numerous requests from Lender, to provide financial statements as required by Sections 7.3(b) and 7.3(c) of the Loan Agreement;

(h)    Guarantors' failure to maintain the minimum net worth and aggregate liquidity required by Section 7.4 of the Loan Agreement and to provide the financial information required by Section 7.3(g);

(i)    Guarantors' failure to comply with their obligations pursuant to Section 11.1 of the Loan Agreement to ensure Borrower's compliance with its obligations under the Loan Agreement.

40.    Based upon the uncured Events of Default, Lender demanded the immediate payment by June 2, 2008 of all of the outstanding principal and accrued and unpaid interest under the Note, together with all applicable charges and all costs, expenses and attorneys' fees incurred by Lender in connection with the collection of the indebtedness evidenced by the Note, and any other amounts lawfully due and owing in connection with the Loan, which on that date amounted to $18,764,150.39, exclusive of Lender's costs, expenses and attorneys' fees. Despite Lender's demand, Borrower and Guarantors have failed and refused to pay the amounts due and demanded.

41.    Accordingly, Borrower is in default of the Loan Agreement and Guarantors are in default of the Guarantees and the foregoing amounts are due and owing to Lender as of June 2, 2008 by each of Guarantors, plus default interest accruing thereafter at the per diem rate of $12,248.82 and attorneys' fees in an amount to be determined.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

42.    Lender repeats and realleges the allegations set forth in paragraphs 1 through 41 as if fully set forth herein.

43.    Lender has fully complied with all of its obligations under the Loan Agreement and the Guarantees.

44.    Lender has demanded that Guarantors fulfill their Guaranteed Obligations under the Guarantees, including that they cure the Events of Default under the Loan Agreement and pay the amounts due under the Loan Agreement and the Guarantees. Guarantors have failed and refused to do so.

45.     By reason of the foregoing, there is a concrete, present and justiciable controversy concerning the respective rights and obligations of Lender and Guarantors under the Loan Agreement and the Guarantees.

46.     There is no adequate remedy at law.

47.     Accordingly, Lender seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Guarantors are in default under the Loan Documents and thus, Lender is entitled to enforce all of its rights and pursue all of its remedies under the Loan Documents in connection with Guarantors' defaults thereunder.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Contract)

48.     Lender repeats and realleges the allegations set forth in paragraphs 1 through 47 as if fully set forth herein.

49.     Lender has fully complied with all of its obligations under the Loan Agreement and the Guarantees.

50.     Notwithstanding Lender's compliance, Guarantors have refused and ignored Lender's demands to cure the defaults under the Loan Agreement and under the Guarantees and to pay the amounts now due and owing to Lender.

51.     Guarantors have breached their Guaranteed Obligations under the Guarantees by, *inter alia*, refusing to cure the defaults under the Loan Agreement and to pay the amounts now due and owing to Lender.

52.     As a direct and proximate result of the breach of the Guarantees by Guarantors, Lender has been damaged.

53.     Based upon the foregoing breaches by Guarantors of their contractual obligations under the Guarantees, Lender is entitled to a judgment against each of Guarantors in the amount

of $18,764,150.39 due and owing as of June 2, 2008 under the Loan Agreement and the Guarantees, with default interest continuing thereafter at the rate of $12,248.82 per diem until the entry of judgment, plus sums, if any, incurred by Lender in respect of payment of amounts due under the Senior Debt, together with any applicable interest;.

**WHEREFORE**, Lender demands judgment against each of the Defendants as follows:

(a)    on the First Claim for Relief, a judicial determination and declaration that Guarantors are in default under the Loan Documents and thus, Lender is entitled to enforce all of its rights and pursue all of its remedies under the Loan Documents in connection with Guarantors' defaults thereunder;

b)    on the Second Claim for Relief, damages in the amount of $18,764,150.39, due as of June 2, 2008 under the Loan Agreement and the Guarantees, with default interest continuing thereafter at the rate of $12,248.82 per diem until the entry of judgment, plus any sums incurred by Lender in respect of payment of amounts due under the Senior Debt, together with any applicable interest;

(c)    for the reasonable costs, expenses and attorneys' fees incurred by Lender in enforcing its rights, in an amount to be determined; and

(d) for such other and further relief as is just and proper, together with the

costs and disbursements of this action.

Dated: New York, New York
   June 6, 2008

        KATTEN MUCHIN ROSENMAN LLP

      By: _____

        Michael S. Gordon (MG-2181)
        Diane da Cunha (DC-1510)
        575 Madison Avenue
        New York, New York 10022
        (212) 940-6666

        Attorneys for Plaintiff
        BA CHUB CAY, LLC

**Exhibit A**

$16,000,000

LOAN AND SECURITY AGREEMENT

by and among

CHUB CAY CLUB ASSOCIATES LTD. AND CHUB CAY RESORTS LTD.

together as Borrower,

WALTER J. MCCRORY, BOB L. MOSS, AND KAYE PEARSON,

collectively as Guarantors

and

BA CHUB CAY, LLC,

as Lender

Dated:  As of May 10, 2006

LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement"), dated as of May 10, 2007, by and among CHUB CAY CLUB ASSOCIATES LTD. and CHUB CAY RESORTS LTD., companies incorporated under the laws of the Commonwealth of The Bahamas, each having a principal place of business at c/o Chub International, L.C., 1510 S. E. 17th Street, Suite 400A, Fort Lauderdale, Florida 33316 ("Borrower"), WALTER J. MCCRORY, BOB L. MOSS, and KAYE PEARSON, each having an office at c/o Chub International, L.C., 1510 S. E. 17th Street, Suite 400A, Fort Lauderdale, Florida 33316 (collectively, the "Guarantors," and each, individually, a "Guarantor"), and BA CHUB CAY, LLC, a Delaware limited liability company, whose address is c/o Blackacre Capital Management, LLC, 299 Park Avenue, New York, New York 10171 ("Lender").

RECITALS:

WHEREAS, Borrower and Lender desire to enter into this Agreement to describe the terms and conditions upon which Lender agrees to make and Borrower agrees to borrow an up to $16,000,000 credit facility, all in accordance with the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, each of Guarantors and Lender hereby agree as follows:

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

Section 1.1. Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accounting Rules" means GAAP consistently applied.

"Accounts" means Borrower's present and future rights to payment of money, accounts and accounts receivable (including, without limitation, all now existing or hereafter arising rights) including, without limitation, present and future rights to payment of money, accounts and accounts receivable including, without limitation, all now existing or hereafter arising rights arising from or relating to the development, use, operation or sale of the Property and the other Collateral or any improvements thereon, including, without limitation, (a) all rights to payment for the rental of office or other space or for goods sold or leased or for services rendered, whether or not yet earned by performance, (b) all rights to payment from any consumer credit, charge, entertainment or travel card or service organization or entity, (c) all reserves, deferred payments, refunds, cost savings payments and deposits no matter how evidenced and whether now or later to be received from third parties (including all earnest money sales deposits) or deposited with Borrower by third parties (including all earnest money sales deposits) or deposited by Borrower with third parties (including all utility deposits), (d) all chattel paper, instruments, documents, promissory notes, drafts and letters of credit (other than any letters of credit in favor of Lender), (e) all accounts created, established and/or governed by the Cash

1

Management Agreement, and any and all other accounts held by or on behalf of Lender and/or Borrower pursuant to this Agreement, and (f) all contracts and agreements which relate to any of the foregoing.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, has the power to vote 10% or more of the Voting Stock of such Person or that, directly or indirectly, Controls, is Controlled by or is under common Control with such Person.

"Agreement" means this Loan and Security Agreement and all schedules and exhibits hereto, as amended, modified, supplemented or restated from time to time.

"Approved Budget" means the Budget approved by Lender from time to time as described in Section 7.3 hereto. Attached hereto as Schedule 1 is the Approved Budget for 2007.

"Approved Business Plan" means the business plan of Borrower with respect to the acquisition, development, marketing and sale of the Property approved by Lender from time to time as set forth in Section 7.3 hereof. The Approved Business Plan for 2007 is attached hereto as Schedule 2.

"Approved Infrastructure Improvements" means the Infrastructure Improvements to be constructed by Borrower consistent with the then Approved Business Plan and consistent with the Plans and Specifications and Legal Requirements.

"Approved Loan Purposes" means developer equity, pre-development costs, buying-out existing partners, loan costs (including principal, fees and other charges), interest and such other purposes as Lender may approve in its reasonable discretion.

"Asset Manager" is defined in Section 9.2.

"Assignee" means any assignee under an Assignment and Acceptance.

"Assignment and Acceptance" means an assignment and acceptance entered into by an Assignor and an Assignee which is substantially in the form of Exhibit B and otherwise acceptable to Lender, all in accordance with Section 9.1.

"Assignor" means any assignor under an Assignment and Acceptance.

"Available Cash" means any and all sums paid to or for the benefit of Borrower (or any of its direct or indirect owners) at any time including, without limitation any and all: (a) Net Sales Proceeds; (b) Insurance Proceeds; (c) Condemnation Proceeds; and (d) Property Revenues less, in all such cases, reserves reasonably approved by Lender.

"Award" means any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"Bankruptcy Code" means (i) Title 11 of the United States Code entitled "Bankruptcy," as amended from time to time, together with all rules and regulations promulgated thereunder.

"Blackacre Entity" shall mean (a) Lender, (b) Blackacre Institutional Partners, LP, or (c) any corporation, partnership, limited liability company or other entity in which Stephen Feinberg

2

or Ronald J. Kravit controls or over which either of them exercises investment management authority, either directly or indirectly, or is under the common control or common investment management authority, either directly or indirectly, of Stephen Feinberg or Ronald J. Kravit.

"Borrower" is defined in the recital of parties to this Agreement.

"Borrower Entity" means, collectively, (i) Borrower, (ii) any Pledgor, and (iii) any Guarantor.

"Budget" means a budget setting forth the projected revenues and costs and expenses (including, without limitation, costs to construct the Infrastructure Improvements) for the acquisition, development, marketing, ownership, operation and sale of the Property and for Borrower for each calendar year commencing with calendar year 2007, shown on a consolidated basis.

"Building Approvals" means all applicable governmental approvals, permits, concessions, and licenses held or granted to Borrowers, providing for works comprising the Development or the operation thereof.

"Building Contracts" means each building contract or contracts and each Professional Team or other consultant's contract entered into between each of Borrowers and the relevant contractor or consultant providing for the carrying out of any part of the works comprising the Development and includes (where the context permits) any substitute contract(s) and/or any amendments and additions thereto which have been approved by Lender.

"Business Day" means a day of the year on which banks are not required to open in New York City, the Bahamas or the city in which the principal office of the Person servicing the Loan on behalf of Lender, if any, is located.

"Capitalized Leases" means, with respect to any Person, any leases of the Property by such Person, as lessee, which, in accordance with GAAP, is required to be accounted for as a capital lease on the balance sheet of such Person.

"Cash Management Agreement" means, that certain Cash Management and Security Agreement, dated the Closing Date, among applicable Pledgors, Borrower and Lender, as the same may be amended, modified, supplemented and/or restated from time to time.

"Caterpillar Debt" means indebtedness in the aggregate amount of $6,278,761.60 payable to Caterpillar Financial Services Corporation.

"Change of Control" means (a) with respect to any Person, any Equity Transfer that results in a change in the Person or Persons that directly or indirectly Control such Person; (b) any time that International Marinas - Chub, Ltd. ceases to have sole right to vote for the board of directors of Borrower; or (c) such time as International Marinas - Chub, Ltd. ceases to own less than 100% of the ownership interests of Borrower.

"Closing Date" means the date on which Borrower shall execute and deliver the Loan Documents and Lender shall disburse any proceeds of the Loan.

3

"Code" means the Internal Revenue Code of 1986, as amended, and any successor thereto.

"Collateral" means all "Collateral" referred to in the Collateral Documents and as set forth in Section 2.9 herein, and all other property of Borrower or any Pledgor that is subject to any Lien in favor of Lender.

"Collateral Documents" means the Cash Management Agreement, the Equity Pledge Agreements, each Guaranty, the Completion Guaranty, the Financing Statements and any other agreement that creates or purports to create a Lien in favor of Lender securing, inter alia, the obligations of Borrower and the Borrower Entities under the Loan Documents.

"Collection Account" has the meaning set forth in Section 4.1(a).

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, or in lieu, or in anticipation of, the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any part thereof.

"Condemnation Proceeds" means the net amount of the Award, after deduction of actually incurred reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same.

"Consolidated" refers to the consolidation of accounts in accordance with GAAP.

"Construction Contract" means one or more construction agreements in form and substance reasonably satisfactory to Lender between Borrower and any Contractor covering construction of any Infrastructure Improvements or other improvements. A list of all currently effective Construction Contracts is attached hereto as Schedule 4A.

"Consulting Contract" means one or more consulting agreements in form and substance reasonably satisfactory to Lender between Borrower and a third party consultant pursuant to which such third party consultant assists Borrower in obtaining entitlements for the Property. A list of all currently effective Consulting Contracts is attached hereto as Schedule 4B.

"Contractor" means Moss & Associates (together with its successors and assigns) or construction manager(s) for the construction of the Infrastructure Improvements, improvements to the Property and/or the development of the Property consistent with the Approved Business Plan as Lender may, from time to time, approve.

"Contracts" means all contracts, agreements, warranties and representations relating to or governing the acquisition, development, sale, operation or marketing of the Property, as amended, modified or supplemented from time to time.

"Control" (including the terms "Controlling," "Controlled by" and "under common Control with") means, with respect to any Person, (i) the ability, through management, voting rights, contract, negative covenants, equitable interest or otherwise, to direct, without the required consent from any Person that is not an Affiliate, the actions, management, affairs or operations of such Person, (ii) the ownership of more than 49% of the direct or indirect right to

4

receive distributions from such Person or (iii) the ownership of more than 49% of the direct or indirect voting rights in such Person.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than (i) trade payables not overdue by more than 90 days incurred in the ordinary course of such Person's business or (ii)(A) capital contributions in respect of down-payments required to be made by such Person in connection with the acquisition of the Property or (B) guaranties by such Person of a Subsidiary's capital contribution obligations in respect of the payment of the purchase price of the Property pursuant to a binding non-installment contract of sale), (c) all Obligations of such Person evidenced by Note, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of the Property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any capital stock of or other ownership or profit interest in such Person or any other Person, (h) all Debt of others referred to in clauses (a) through (g) above or clause (i) below to the extent guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (iii) to supply funds to or in any other manner invest in the debtor (including, without limitation, any agreement to pay for property or services irrespective of whether the Property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss, in each case only to the extent of the maximum potential Obligations of such Person under such agreement, and (i) the amount of any Debt referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"Debt Service Reserve" is defined in Section 3.1.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"Deferred Development Fee" means approximately 42.86% (3 points of 7 points) of the construction management fee payable to Moss & Associates.

"Depository Bank" shall mean collectively, Northern Trust Bank of Florida and/or Scotiabank, Nassau and/or such other bank reasonably approved by Lender.

"Development" means the subdivision works, marina excavation, renovation, construction, re-construction and expansion program to be undertaken in respect of the property commonly known as "Chub Cay Club" and "Chub Cay Marina & Resort" containing in total in

excess of 800 acres situate on Chub Cay, one of the Cays in the Berry Islands in the Commonwealth of the Bahamas, in all cases as set forth in the Plans and Specifications.

"Development Costs" means the aggregate of all sums properly payable by each of Borrower in connection with the Development including (i) all costs fees and expenses (whether professional or otherwise) properly incurred or to be incurred by each Borrower in connection with the Development and (ii) interest payable on the Loans under this Agreement.

"Disclosed Litigation" shall have the meaning specified in Section 6.1(f).

"Environmental Indemnity" shall mean, that certain Environmental Indemnity, dated as of the Closing Date, from Borrower and Guarantors in favor of Lender with respect to the Property.

"Environmental Laws" means any present or future federal, state or local law, statute, ordinance, rule, regulation, code, policy, rule of common law (including without limitation nuisance and trespass), consent order, judicial order, administrative order or other government directive, in each case as amended or supplemented from time to time, that applies to Borrower or to the Property and relates to Hazardous Materials including, without limitation, those relating to industrial hygiene, toxic mold or the use, analysis, generation, manufacture, storage, discharge, release, disposal, transportation, treatment, investigation, or remediation of Hazardous Materials. Any soil or groundwater contaminated by Hazardous Materials at the Property in quantities or concentrations violative of the most stringent applicable federal, state or local standard or guidance or which required reporting, investigation, remediation or other response action is considered for purposes of this Agreement a violation of any applicable environmental law.

"Environmental Reports" means those reports listed on Schedule 5 attached hereto.

"Entitlement Schedule" is defined in Section 6.2(c)(ii).

"Equity Pledge Agreements" means the Equity Pledge and Security Agreements, dated as of the Closing Date, from each of Borrower and the other Pledgors in favor of Lender, as the same may be amended from time to time, together with any subsequent Equity Pledge and Security Agreement from any future Pledgor delivered in connection with the Property for which equity interests may be pledged at a time subsequent to the Closing Date.

"Equity Transfer" means any voluntary or involuntary, direct or indirect, sale, grant, conveyance, encumbrance, pledge or other transfer, by operation of law or otherwise, of any direct or indirect beneficial interest in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Events of Default" is defined in Section 8.1.

"Excess Interest" is defined in Section 2.4(c).

"Excluded Taxes" is defined in Section 2.7(a).

6

"Exit Fee" means, for the period from the date which is eighteen (18) months after the Closing Date to the date which is twenty-four (24) months after the Closing Date, an amount equal to two percent (2.0%) of the Loan, and thereafter an amount equal to three and one-half percent (3.5%) of the original principal amount of the Loan. Prior to the first day of the eighteenth (18th) month following the Closing Date, no Exit Fee shall be due and payable; provided, however, that Borrower shall be obligated to pay the Yield Maintenance Amount during such period in the event of any prepayment of the Loan during such period.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System.

"Financing Statements" means any financing statements, on Form UCC-1, required to perfect Lender's security interest in any Collateral covered by the UCC.

"FIRREA" means The Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73 Stat. 183 (1989) and the regulations adopted pursuant thereto, as the same may be amended from time to time.

"Fiscal Year" means the fiscal year of Borrower which ends on December 31 of each calendar year.

"Fitch" means Fitch Investors Service, L.P.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Governmental Authority" means the United States of America, any state, any foreign governments and any political subdivision or regional division of the foregoing, and any agency, department, court, regulatory body, commission, board, bureau or instrumentality of any of them.

"Grading Contract" means any Contract entered into from time to time by Borrower with respect to the grading of the Property. A listing of all current Grading Contracts is attached hereto as Schedule 6.

"Hazardous Materials" means (a) any pollutants, toxic pollutants, oil, gasoline, petroleum products, asbestos, materials or substances containing asbestos, explosives, chemical liquids or solids, radioactive materials, polychlorinated biphenyls or related or similar materials, or any other solid, liquid or other emission, substance, material, product or by-product defined, listed or regulated as a hazardous, noxious, toxic or solid substance, material or waste or defined, listed or regulated as causing cancer or reproductive toxicity, or otherwise defined, listed or regulated as hazardous or toxic in, pursuant to, or by any federal, state or local law, ordinance, rule, or regulation, now or hereafter enacted, amended or modified, in each case to the extent applicable to the Property including the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Section 9601, et seq.); the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.); the Resource Conservation and Recovery Act (42 U.S.C. Section 6901, et seq.); any so-called "Superfund" or "Superlien" law; the Toxic Substance Control Act of 1976 (15 U.S.C. Section 2601 et seq.); the Clean Water Act (33 U.S.C. Section 1251 et seq.); and the Clean Air Act (42 U.S.C. Section 7901 et seq.), (b) any substance which is or contains asbestos, radon, polychlorinated biphenyl, urea formaldehyde foam insulation, explosive or radioactive material, lead paint, motor fuel or other petroleum hydrocarbons, (c) fungus, mold,

mildew, or other biological agents the presence of which may adversely affect the health of individuals or other animals or materially adversely affect the value or utility of the Property, and/or (d) any other substance which causes or poses a threat to cause a contamination or nuisance with respect to all or any portion of the Property or any adjacent property or a hazard to the environment or to the health or safety of Persons.

"Impositions" means all real estate and personal property taxes, vault charges and all other taxes, levies, assessments and other similar charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of every kind and nature whatsoever, which at any time may be assessed, levied or imposed by, in each case, a Governmental Authority upon the Property or upon the ownership, use, occupancy or enjoyment thereof, and any interest, cost or penalties imposed by such Governmental Authority with respect to any of the foregoing. Impositions shall not include any sales or use taxes or any income taxes payable by any Borrower Entity.

"Indemnified Claim" shall have the meaning specified in Section 10.4(c).

"Indemnified Party" is defined in Section 10.4(b).

"Independent" means, with respect to any specified Person, such a Person who (a) does not have any direct financial interest or any material indirect financial interest in such specified Person or in any of its Affiliates, (b) is not connected with such specified Person as an officer, employee, promoter, underwriter, trustee, partner or director and (c) is not Controlled by or under common Control with, and does not Control, such specified Person.

"Infrastructure Improvements" means the improvements to the Property which are to be installed in connection with preparing the Property for sale including, without limitations, utilities, roads, grading and similar items, as applicable.

"Insurance Proceeds" means the net amount of all insurance proceeds received as a result of damage or destruction to the Property or any improvements thereon, after deduction of the actually incurred reasonable costs and expenses (including, but not limited to reasonable counsel fees), if any, in collecting same.

"Interest Rate" means a per annum rate equal to eighteen and one-half percent (18.5%).

"Intercreditor Agreement" is defined in Section 7.8.

"Insurance Reserve" is defined in Section 3.2.

"Investment" in any Person means any loan or advance to such Person, any purchase or other acquisition of any capital stock or other ownership or profit interest, warrants, rights, options, obligations or other securities of such Person, any capital contribution to such Person or any other investment in such Person, including, without limitation, any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "Debt" in respect of such Person.

"Laws" means all present and future laws, statutes, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations, determinations, awards and court orders of any federal, state, municipal or local government, Governmental Authority, regulatory agency or authority.

8

"Leases" means, with respect to the Property, any and all leases, subleases, occupancy agreements or grants of other possessory interests, whereby Borrower acts as the lessor, sublessor, licensor, grantor or in another similar capacity, now or hereafter in force, oral or written, covering or affecting the Property, or any part thereof, together with all rights, powers, privileges, options and other benefits of Borrower thereunder and any and all guaranties of the obligations of the lessees, sublessees, occupants, and grantees thereunder, as such leases, subleases, occupancy agreements or grants may be extended, renewed, modified or replaced from time to time.

"Legal Requirements" means all applicable laws, statutes, ordinances, rulings, regulations, codes, decrees, orders, policies, guidelines, judgments, covenants, conditions, restrictions, approvals, permits and requirements under any Permitted Encumbrances or of, from or by any Governmental Authority, including zoning, subdivision, land use, environmental, building, safety, health, wetlands and landmark preservation, housing and fire laws and the Americans with Disabilities Act

"Lender" is defined in the recital of parties to this Agreement.

"Lender Parties" is defined in Section 9.1(d).

"Lender's Account" means an account of Lender or Asset Manager (if applicable) designated in writing by such party to Borrower.

"Lien" means any lien, security interest or other charge or encumbrance of any kind.

"Loan" is defined in Section 2.1.

"Loan Account Collateral" has the meaning set forth in Section 4.7.

"Loan Documents" means (i) this Agreement, (ii) the Note, (iii) the Collateral Documents, (iv) the Environmental Indemnity, and (v) any other written agreement, document or instrument between any Borrower Party and Lender evidencing and/or securing the Loan, in each case as amended or otherwise modified from time to time.

"Margin Stock" means "margin security," as that term is defined in Regulation G (12 C.F.R. Part 207) or "margin stock," as that term is defined in Regulation U (12 C.F.R. Part 221) of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the applicable Person, (b) the rights or remedies of Lender under any Loan Document or (c) the ability of Borrower or any other Borrower Entity to perform its respective obligations under the Loan Documents.

"Material Contracts" means (a) the Leases; (b) the Construction Contracts; (c) the Grading Contracts; (d) the Purchase Agreements; (e) Building Contracts; (f) the Consulting Contracts; (g) the Permitted Encumbrances; and (g) any other contracts or agreement (1) in excess of $250,000.00 and (2) which. if not complied with by the applicable Borrower Entity, could reasonably be expected to have a Material Adverse Effect.

9

"Maturity Date" means the date which is thirty-six months from the Closing Date, or such earlier date if the Loan is accelerated.

"Maximum Commitment Amount" means an amount equal to the lesser of (i) $16,000,000.00 and (ii) seventy percent (70%) of the total capitalization of the Property.

"Moody's" means Moody's Investors Service, Inc.

"Net Sales Proceeds" means an amount equal to the gross sales price and other consideration received or receivable in connection with a sale of the Property (or the direct and indirect equity interests in the owner of the Property) minus the sum of: (a) the amount of any sales commission actually paid to an independent broker unaffiliated with a Borrower Entity with respect to such sale and in no event in excess of market rate commissions on similar transactions, (b) the amount of transfer taxes and other reasonable closing costs actually paid by Borrower in connection with such sale, (c) reserves and deposits required by the Senior Loan Documents or any contract of sale for the Property, and (d) other reasonable payments and expenses (including the payment of all outstanding Senior Debt including trade payables for the Property, exclusive of any intercompany debt, and reasonable reserves established and reasonably approved by Lender and as such, shall not be included in the Net Sale Proceeds until such time, if any, as such reserves are released) paid by Borrower in connection with such sale. For purposes herein, Net Sales Proceeds shall also mean and include "net finance/refinance proceeds", i.e., the gross proceeds of a finance or refinance of the Property less all costs, expenses, reserves and fees incurred or established in connection with obtaining such financing.

"Note" means the $16,000,000 revolving promissory note of Borrower payable to the order of Lender, in form and substance satisfactory to Lender, evidencing the indebtedness of Borrower to Lender resulting from the Loan and any Note or Note substituted therefor in accordance with Section 9.1, as the same may be amended, modified, supplemented and/or restated from time to time.

"Obligation" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 8.1(h). Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by Borrower under any Loan Document and (b) the obligation of Borrower to reimburse any amount in respect of any of the foregoing that Lender, in its sole discretion, may elect to pay or advance on behalf of Borrower in accordance with the terms of the Loan Documents.

"OFAC" is defined in Section 6.1(k).

"Officer's Certificate" means the certificate of an executive officer, chief financial officer or other officer or representative with knowledge of the matters addressed in such certificate.

"Organizational Documents" means (i) with respect to any Person that is a corporation, the certificate of incorporation or charter and by-laws of such Person, (ii) with respect to any Person that is a partnership, the partnership agreement and, if a limited partnership, certificate of limited partnership of such person, and (iii) with respect to any Person that is a limited liability company, the articles of organization and the operating agreement of such Person.

"Origination Fee" means three percent (3%) of the Maximum Commitment Amount and is payable upon Closing, which may be payable from Loan proceeds to the extent available to Borrower.

"Other Taxes" is defined in Section 2.7(b).

"Pay Rate" a rate per annum equal to twelve percent (12%).

"Payment Date" means the first (1st) day of each calendar month, commencing June 1, 2007, during such time as any portion of the Loan remains unpaid; provided, however, that if such Payment Date is not a Business Day, such Payment Date shall be the immediately succeeding Business Day.

"Permitted Debt" means:

(i)      the Senior Debt;

(ii)      Debt related to the refinancing of the Senior Debt; provided that such refinancing is approved by Lender, which approval shall not be unreasonably withheld, conditioned or delayed;

(iii)      The Caterpillar Debt;

(iv)      unsecured Debt not evidenced by a promissory note incurred in the ordinary course of business for the deferred purchase price of goods, property or services, maturing within one year from the date created, and aggregating not more than $1,000,000 at any one time outstanding;

(v)      trade payables not more than ninety (90) days past due incurred in the ordinary course of business; provided, that if such trade payables exceed $25,000, they are consistent with the Approved Budget;

(vi)      endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and

(vii)      unsecured Debt loaned by shareholders, members and/or partners in Borrower, provided such Debt is expressly made subordinate to the Loan.

"Permitted Encumbrances" means the matters identified in the title reports and/or title policy listed on Schedule 8.

"Permitted Equity Transfers" shall mean any Equity Transfer resulting from the death of any natural Person, (a) by any natural Person to any family member(s) of such Person or (b) to any trust(s) established for the benefit of such family member(s) in connection with the bona fide

11

estate planning activities of such Person, or (c) any Equity Transfer that does not result in a Change of Control.

"Permitted Transferee" means: (i) Exeter Capital Partners, LLC, (ii) any Blackacre Entity, or (iv) any one or more of Lehman Brothers Holdings Inc., Goldman Sachs Mortgage Company, Bank of America N.A., Deutsche Bank AG, Cayman Islands Branch, Bankers Trust Company, Bear Stearns & Co., JP Morgan Chase Bank, Greenwich Capital Markets Incl., UBS AG, Stamford Branch, or Fleet National Bank, or (iii) any other Person approved in writing by the Senior Lender.

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Plans and Specifications" means the final drawings and specifications for the development and construction of the Approved Infrastructure Improvements (as the same may be amended in accordance with the provisions provided by this Agreement), which plans and specifications and all amendments thereto shall be: (i) subject to Lender's approval; and (ii) in accordance with all applicable Legal Requirements.

"Pledgor" means any pledgor party under any Equity Pledge Agreement.

"Professional Team" means, collectively, the project manager, the architect, the mechanical and electrical consultants, the structural engineers and/or the quantity surveyor employed or to be employed by Borrowers in connection with the Development.

"Prohibited Equity Transfer" means any (a) Equity Transfer other than a Permitted Equity Transfer and (b) any transfer that would be otherwise deemed a Permitted Equity Transfer, if at the time of such proposed transfer, an Event of Default has occurred and is continuing under the Loan Documents.

"Prohibited Transferee(s)" has the meaning set forth in Section 9.1(a).

"Property" means, the real property legally described on Schedule 9 attached hereto, together with all rights pertaining to the Property and improvements, together with any other property acquired directly or indirectly by Borrower during the term of the Loan.

"Property Revenues" means all rents, revenues, issues or profits, including deposits under Building Contracts, reimbursements under cost sharing agreements and all other sums, proceeds, revenues or income generated by the Property plus any other income earned on the investment of any such proceeds.

"Proprietary Rights" has the meaning set forth in Section 6.1(l).

"Purchase Agreements" means any and all agreements to purchase the Property. A listing of all currently effective Purchase Agreements is attached hereto as Schedule 10.

"Register" is defined in Section 9.4(a).

"Registered Loan" is defined in Section 9.4(a).

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Senior Debt" means the credit facilities in a maximum principal amount of $45,000,000.00 from ScotiaBank (Bahamas) Limited ("Senior Lender") established pursuant to the Senior Loan Documents, together with all accrued and unpaid interest thereon

"Senior Loan Documents" means, collectively, the loan documents evidencing and/or securing the Senior Debt, in each case as amended or otherwise modified from time to time in accordance with the terms of the Intercreditor Agreement.

"Solvent" and "Solvency" mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subsidiary" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or Controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"Substantial Completion of Development" means and shall be deemed to have occurred with respect to the Development at such time as the Development shall have been substantially completed in accordance with the Plans and Specifications and Building Contracts and the Development is ready for occupancy in the case of residences and operation in the case of the marina and club house as evidenced by the issuance by the appropriate Governmental Authority of a certificate(s) of occupancy.

"Tax Reserve" is defined in Section 3.2.

"Taxes" is defined in Section 2.7(a).

"UCC" means the Uniform Commercial Code as in effect in New York from time to time.

"Voting Stock" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"Yield Maintenance Amount" means the amount of interest that would have accrued on the outstanding principal balance of the Loan (immediately prior to the applicable prepayment), from the date of the prepayment to and including the eighteenth (18th) payment date, if no prepayment were to occur and if the rate of interest were the Interest Rate.

**Section 1.2.** <u>Computation of Time Periods</u>.   In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

**Section 1.3.** <u>Accounting Terms and Adjustments</u>.  All accounting terms not specifically defined herein shall be construed in accordance with the Accounting Rules.

**Section 1.4.**    <u>Rules of Usage</u>.    The following rules of usage shall apply to this Agreement:

(a)    Singular words shall connote the plural as well as the singular, and vice versa (except as indicated), as may be appropriate;

(b)    Unless otherwise indicated, references in this Agreement to any Articles, Sections, Schedules or Exhibits are references to Articles, Sections, Schedules or Exhibits of this Agreement;

(c)    The headings, subheadings and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect any meanings, construction or effect;

(d)    "or" is not exclusive and "include" and "including" are not limiting; and

(e)    "hereby," "herein," "hereof," and "hereunder" refer to this Agreement, as it may be amended, modified or supplemented from time to time in accordance with its terms.

14

**ARTICLE II**
AMOUNT AND TERMS OF THE LOAN

Section 2.1. Loan.

(a)    Loan Amount.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Borrower and the other Borrower Entities contained in this Agreement and in the other Loan Documents, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, an amount equal to the Maximum Commitment Amount (the "Loan").  Proceeds of the Loan shall be utilized solely for Approved Loan Purposes.

(b)    Note.  On the Closing Date, Borrower shall execute and deliver the Note.

Section 2.2. Repayment of the Loan.  Subject to the provisions of Section 2.3, Borrower shall repay to Lender the aggregate outstanding principal amount of Loan together with all accrued interest, fees and expenses, including, inter alia, the Exit Fee on the Maturity Date.

Section 2.3. Voluntary Prepayments.  The Loan may be prepaid, in whole or in part without premium or penalty, upon no less than ten (10) days prior notice by Borrower to Lender. If such notice is given, Borrower shall, consistent with such notice, prepay the applicable portion of the outstanding principal amount of the Loan together with accrued interest at the applicable interest rate to the date of such prepayment on the principal amount prepaid, and together with the applicable Yield Maintenance Amount or Exit Fee.

Section 2.4. Interest.

(a)    Scheduled Interest.  The Loan shall bear interest at the Interest Rate. Notwithstanding the foregoing, to the extent Available Cash is insufficient to pay interest currently at the Interest Rate, Borrower shall pay interest on the outstanding principal balance of the Loan from the date of disbursement of the Loan until such principal amounts shall be paid in full, at a rate per annum equal to the Pay Rate (subject to 2.4(b) below), payable in arrears on each applicable Payment Date, which payment may be made from the Debt Service Reserve to the extent of funds contained therein.  The difference between interest payable at the Interest Rate and interest actually paid at the Pay Rate shall accrue and be compounded quarterly.  If Loan proceeds are disbursed to an escrowee, the Loan shall commence to bear interest from and including the date of such disbursement to such escrowee regardless of the date such proceeds are disbursed from escrow.  A balloon payment will be required on the Maturity Date, together with the payment of any Exit Fee.

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, Borrower shall pay interest on the unpaid principal balance of the Note, payable in arrears on the dates referred to in clause (a) of this Section 2.4 and on demand, at a rate per annum equal at all times to the lesser of (x) the maximum non-usurious rate permitted by law and (y) 23.50%.

(c)    Interest Laws.  Notwithstanding any provision to the contrary contained in this Agreement or the other Loan Documents, Borrower shall not be required to pay, and Lender shall not be permitted to collect, any amount of interest in excess of the maximum amount of

15

interest permitted by law ("Excess Interest"). If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Agreement or in any of the other Loan Documents, then in such event: (1) the provisions of this Section shall govern and control; (2) Borrower shall not be obligated to pay any Excess Interest; (3) any Excess Interest that Lender may have received hereunder shall be, at Lender's option, (a) applied as a credit against the outstanding principal balance of the Obligations due and owing to Lender (without any prepayment penalty or premium therefor) or for accrued and unpaid interest thereunder (not to exceed the maximum amount permitted by law), (b) refunded to the payor thereof, or (c) any combination of the foregoing; (4) the interest rate(s) provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "Maximum Rate"), and this Agreement and the other Loan Documents shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (5) Borrower shall not have any action against Lender for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any Obligation due and owing to Lender is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on such Obligations due and owing to Lender shall, to the extent permitted by law, remain at the Maximum Rate until Lender shall have received or accrued the amount of interest which Lender would have received or accrued during such period on Obligations due and owing to Lender had the rate of interest not been limited to the Maximum Rate during such period.

**Section 2.5.** <u>Domicile of Loan</u>. Lender may transfer and carry the Loan at, to or for the account of any branch office, Subsidiary or Affiliate of Lender.

**Section 2.6.** <u>Payments and Computations</u>.

(a)    Borrower shall make each payment hereunder and under the Note, irrespective of any right of counterclaim, defense or set-off, not later than 2:00 P.M. (New York City time) on each Payment Date in U.S. dollars to Lender at Lender's Account in same day funds. All payments shall be by the wire transfer of good immediately available funds. In the event funds are received after 2:00 p.m. (New York City time), such funds shall be deemed to have been paid by Borrower on the following Business Day.

(b)    Borrower hereby authorizes Lender, if and to the extent payment owed to Lender is not made when due hereunder or under the Note, to charge from time to time against any or all of Borrower's accounts with Lender any amount so due.

(c)    All computations of interest and fees shall be made by Lender (or any Person servicing the Loan on behalf of Lender) on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees  are payable. Each determination by Lender (or any Person servicing the Loan on behalf of Lender) of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder or under the Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

16

**Section 2.7.** <u>Taxes</u>.

(a)     Any and all payments by Borrower hereunder or under the Note or any other Loan Document shall be made in accordance with Section 2.6, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all interest, penalties, additions to tax or other liabilities with respect thereto, excluding taxes that are imposed on Lender's (or any transferee or assignee thereof, including a participation holder (such entity, a "Transferee")) overall net income by the such Person is organized or has its principal lending office (all such excluded taxes being hereafter referred to as "Excluded Taxes" and all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under the Note being hereinafter referred to as "Taxes"). If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to Lender (or any Transferee) (i) the sum payable to Lender shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.7) Lender (or any Transferee) receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant Governmental Authority.

(b)     In addition, Borrower shall pay any present or future stamp, documentary, recording, excise, property or similar taxes, charges or levies that arise from any payment made hereunder or under the Note or any other Loan Document or from the execution, delivery, recording, filing or registration of, performing under, or otherwise with respect to, this Agreement, the Note or any other Loan Document other than Excluded Taxes (hereinafter referred to as "Other Taxes").

(c)     Borrower shall indemnify Lender for and hold it harmless against the full amount of Taxes and Other Taxes, and for the full amount of taxes of any kind imposed by any jurisdiction on amounts payable under this Section 2.7, imposed on or paid by Lender or any Transferee and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days from the date Lender or any Transferee makes written demand therefor.

(d)     Within thirty (30) days after the date of any payment of Taxes or Other Taxes, Borrower shall furnish to Lender, at its address referred to in Section 10.2, evidence of such payment. In the case of any payment hereunder or under the Note by or on behalf of Borrower through an account or branch outside the United States or by or on behalf of Borrower by a payor that is not a United States person, if Borrower determines that no Taxes are payable in respect thereof, Borrower shall furnish, or shall cause such payor to furnish, to Lender, at such address, an opinion of counsel acceptable to Lender stating that such payment is exempt from Taxes. For purposes of this subsection (d) and subsection (e) below, the terms "United States" and "United States person" shall have the meanings specified in Section 7701 of the Code.

(e)     The obligations of Borrower under this Section 2.7 shall survive the termination of this Agreement and the payment of the Loan and all other amounts payable hereunder.

**Section 2.8.** <u>Late Charge</u>.  In the event that any installment of interest shall become overdue for a period in excess of ten (10) days, a "late charge" in an amount equal to five percent

17

(5%) of the amount so overdue may be charged to Borrower by Lender for the purpose of defraying the expenses incident to handling such delinquent payments. Such late charge shall be in addition to, and not in lieu of, any other remedy Lender may have and is in addition to Lender's right to collect reasonable fees and charges of any agents or attorneys which Lender may employ in connection with any Default and in accordance with the Loan Documents.

Section 2.9.  Security for the Loan.

(a)    The Loan shall constitute one general obligation of Borrower to Lender and the Obligations shall be secured by (a) the Collateral Documents and (b) the security interests and Liens granted in this Agreement and in the other Loan Documents with respect to the Collateral. The Collateral for the Loan shall also include all other collateral as described in the Collateral Documents.

(b)    Borrower may, from time to time, request that Lender accept, as substitute or additional Collateral, unencumbered equity interests in one or more development projects (primarily residential) or other assets of Borrower in substitution for a portion of the Collateral. Lender may, in its sole and absolute discretion, elect to accept such equity interests or assets as Collateral in replacement of (or in addition to) the Collateral or reject such offer of substitution or addition.    Any substituted equity interests or other assets must be, in Lender's sole determination, of equal or greater value and liquidity to the equity interests which are being requested to be released.   In addition, as a condition to any such release, Borrower will be required to obtain any and all necessary consents and approvals required by Lender and to otherwise satisfy any and all conditions precedent identified by Lender at the time of the proposed substitution.

Section 2.10.  Application of Payments.  Except as otherwise expressly provided in the last sentence of this Section 2.10, all payments made hereunder shall be applied first, to the payment of any late charges and other sums (other than principal and interest) due from Borrower to Lender under the Loan Documents, second, to any interest then due at the default rate of interest described above, third to interest then due at the Pay Rate, fourth to any accrued and unpaid interest, and last to the principal amount. Following and during the continuance of an Event of Default, all sums collected by Lender shall be applied in such order of priority to such items set forth below as Lender shall determine in its sole discretion:  (i) to the costs and expenses, including reasonable attorneys' and paralegals' fees and costs of appeal, incurred in the collection of any or all of the Loan due or the realization of any Collateral; and (ii) to any or all unpaid amounts owing pursuant to the Loan Documents in any order of application as Lender, in its sole discretion, shall determine.

Section 2.11.  Lender's Records; Mutilated, Destroyed or Lost Notes.  The balance on Lender's books and records shall be presumptive evidence (absent manifest error) of the amounts due and owing to Lender by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's obligation to pay the Obligations.  In case the Note shall become mutilated or defaced, or be destroyed, lost or stolen, Borrower shall, upon request from Lender, execute and deliver a new Note of like principal amount in exchange and substitution for the mutilated or defaced Note, or in lieu of and in substitution for the destroyed, lost or stolen Note.  In the case of a mutilated or defaced Note, the mutilated or defaced Note shall be surrendered to Borrower upon delivery to Lender of the new Note.  In the case of any destroyed, lost or stolen Note, Lender shall furnish to Borrower, upon delivery to

18

Lender of the new Note (i) certification of the destruction, loss or theft of such Note and (ii) such security or indemnity as may be reasonably required by Borrower to hold Borrower harmless.

## ARTICLE III
### RESERVES

**Section 3.1.** <u>Debt Service Reserve.</u>  On the date hereof, Borrower shall deposit with Lender the sum of $1,920,000.00 (the "Debt Service Reserve"), which such Debt Service Reserve may be withheld by Lender from the proceeds of the Loan. The Debt Service Reserve shall at all times remain under the sole dominion and control of Lender, subject to the terms and provisions of this Section 3.1. Lender shall have no obligation to invest the Debt Service Reserve.  No interest on the Debt Service Reserve shall accrue or be payable by Lender to Borrower.  Lender shall have no obligation to segregate the Debt Service Reserve in a separate account and Lender may commingle such funds with other funds of Lender.  The Debt Service Reserve may be held by Lender in an account in Lender's name or in such other manner as Lender shall elect.  In the event that monthly debt service on the Loan is not paid by Borrower, Lender shall from time to time during the term hereof, advance interest payments from the Debt Service Reserve at the Pay Rate to fund current debt service. If an Event of Default exists, Lender may apply funds in the Debt Service Reserve, together with interest accrued thereon, if any, to the Obligations in any order or manner as Lender may determine.

**Section 3.2.** <u>Tax Reserve and Insurance Reserve.</u>  Borrower shall deposit (or cause to be deposited) with Lender (or such agent of Lender as Lender may designate in writing to Borrower from time to time), monthly, on each Payment Date, 1/12th of (i) the annual charges (as estimated by Lender) for all Impositions relating to the Property as a reserve ("Tax Reserve") for the payment of Impositions and (ii) the annual insurance premiums with respect to the insurance required pursuant to this Agreement as a reserve ("Insurance Reserve") for the payment of such insurance premiums.  Borrower shall also deposit (to be held as part of the applicable Reserve) with Lender, simultaneously with such monthly deposits and/or on the Closing Date, a sum of money which, together with such monthly deposits, will be sufficient to make the payment of each such charge or premium at least thirty (30) days prior to the date when due.  Should such charges or premiums not be ascertainable at the time any deposit is required to be made, the deposit shall be made on the basis of Lender's reasonable estimate.  When the charges or premiums are fixed for the then current year or period, Borrower shall deposit with Lender any deficiency within fifteen (15) days following Lender's demand.  Should an Event of Default occur, the funds maintained in such Reserves may be applied in payment of the charges for which such funds shall have been deposited or to the payment of the Obligations or any other charges affecting the Property as Lender in its sole and absolute discretion may determine, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender as herein provided.  Borrower shall provide Lender with bills and all other documents necessary for the payment of the foregoing charges at least ten (10) days prior to the date on which each payment thereof shall first become delinquent.  So long as (i) no Event of Default exists, (ii) Borrower have provided Lender with the foregoing bills and other documents in a timely manner, and (iii) sufficient funds are held in the applicable Reserve by Lender for the payment of the Impositions and insurance premiums relating to the Property, as applicable, Lender shall, in its sole discretion either pay said items directly or allow such funds to be used by Borrower to pay said items.  All refunds of Impositions and insurance premiums shall be deposited into the applicable of the Tax Reserve or the Insurance Reserve.

19

Borrower shall be relieved of its obligation to make deposits into the Tax Reserve or the Insurance Reserve above, provided that (a) no Event of Default shall have occurred and be continuing or (b) Lender receives evidence acceptable to it of the payment of all such Impositions and insurance premiums.

# ARTICLE IV
## ACCOUNTS/CASH MANAGEMENT

**Section 4.1.** Establishment of Accounts.

(a)    Collection Account.  Borrower has established an account at each Depository Bank, with the name "CHUB CAY CLUB ASSOCIATES LTD." for deposits required to be made pursuant to the Senior Loan Documents (the "Collection Account").

(b)    Borrower represents, warrants and covenants that (i) the Collection Account is and at all times shall be under the sole dominion and control of the Lender under the Senior Loan Documents and, if Borrower shall have fully satisfied the Senior Debt, under the sole dominion and control of Lender; and (ii) Borrower has caused the Depository Bank to agree in writing, and shall continue to require Depository Bank, to comply with instructions originated by the lender under the Senior Loan Documents directing disposition of the funds in the Collection Account without further consent by Borrower.

(c)    · Borrower represents, warrants and covenants that the Collection Account is and shall be maintained as a "securities account" (as in Section 8 501(a) of the UCC); (i) Borrower shall have no right to give entitlement orders with respect to the Collection Account and no Loan Account Collateral shall be released to Borrower from the Collection Account; and (ii) all securities or other property underlying any financial assets credited to the Collection Account shall be registered in the name of Depository Bank or indorsed to Depository Bank or in blank and in no case will any financial asset credited to the Collection Account be registered in the name of Borrower, payable to the order of Borrower or specially indorsed to Borrower.

(d)    Cash Management Agreement.  Borrower covenants that the Collection Account shall be maintained in accordance with the terms of the Senior Loan Documents or, if Borrower shall have fully satisfied the Senior Debt, with the terms hereof and of the Cash Management Agreement.  Borrower covenants and agrees that, prior to indefeasible satisfaction of the Obligations, the Cash Management Agreement shall not be amended, supplemented or modified without the prior written consent of Lender, which consent Lender may grant or withhold in its sole and absolute discretion.

(e)    No Other Accounts.  Borrower represents and warrants that there are no accounts other than the Collection Account maintained by Borrower or any other Person with respect to the collection of Available Cash and Borrower covenants that, until the Loan is indefeasibly re-paid in full and the indefeasible satisfaction of the Obligations neither Borrower nor any other Person shall open any accounts for the collection of Available Cash except for the Collection Account and the other Accounts specified above.

(f)    Miscellaneous Account Provisions.  The Collection Account shall be subject to such applicable laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking or Governmental Authority, as may now or hereafter

20

be in effect. Interest accruing on each Account, if any, shall be periodically added to the principal amount of such Account and shall be held, disbursed and applied in accordance with the provisions of this Agreement. All statements relating to the Collection Account shall be issued simultaneously by Depository Bank to Lender and Borrower. Borrower shall be the beneficial owner of the Collection Account for federal and state income tax purposes and shall report all income on the Collection Account. Returned items in the Collection Account will be charged against Borrower in the succeeding month or, if later, when actually returned.

**Section 4.2.** <u>Deposits into Accounts</u>. Borrower hereby covenants that subject only to the rights of any Lender under the Senior Loan Documents all Available Cash shall be deposited directly into the Collection Account no later than two (2) Business Days following its receipt. Until so deposited, any Available Cash required to be deposited into the Collection Account pursuant to this Agreement held by any Borrower Entity, shall be deemed to be Loan Account Collateral and shall be held in trust by such Person for the benefit of Lender, as secured party, and shall not be commingled with any other funds or property of such Person.

**Section 4.3.** <u>Transfers from Collection Account</u>. (a) Borrower hereby irrevocably authorizes Lender, from and after the date on which the Senior Debt is fully satisfied, to transfer to the extent of available funds on deposit that have been deposited into the Collection Account during the period commencing on the immediately preceding Payment Date and ending on the day immediately preceding the Payment Date in question, and Lender shall transfer from or within the Collection Account on each Payment Date, funds in the following amounts and in the following order of priority:

(i)    funds in an amount equal to the amount of debt service on the Loan on such Payment Date to the Lender, but only to the extent funds are not available to satisfy debt service on the Loan from the Debt Service Reserve; and

(ii)    The remaining funds (if any) on deposit in the Collection Account after the foregoing transfers and, provided no Event of Default shall have occurred and be continuing, shall be transferred to Borrower.

(b)    Borrower hereby irrevocably authorizes Lender, from and after the date on which the Senior Debt is fully satisfied, to transfer to the extent of any (i) Net Sales Proceeds; (ii) Insurance Proceeds; or (iii) Condemnation Proceeds are deposited into the Collection Account in the following amounts and in the following order of priority: first, to pay in full all amounts due and payable under the Loan; and thereafter, to Borrower..

**Section 4.4.** <u>Accounts</u>. Borrower shall execute and deliver to Lender a Cash Management Agreement (together with any modifications, amendments or replacements thereof, the "Cash Management Agreement") for the Property, pursuant to which the Depository Bank (a) acknowledges receipt of the Cash Management Agreement and (b) agrees to comply with the instructions contained therein.

**Section 4.5.** <u>Creation of Security Interest in Accounts</u>. Borrower hereby pledges, transfers and assigns to Lender, and grants to Lender, as additional security for the Obligations, a continuing perfected second priority security interest in and to, and a second priority lien upon all of Borrower's right, title and interest in and to:

21

(a)    the Accounts and all amounts which may from time to time be on deposit in each of the Accounts;

(b)    all cash, property or rights transferred to or deposited in each of the Accounts from time to time;

(c)    all certificates and instruments, if any, from time to time representing or evidencing any such Account or any amount on deposit in any thereof, or any value received as a consequence of possession thereof, including, without limitation, all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Accounts;

(d)    all monies, chattel paper, checks, notes, bills of exchange, negotiable instruments, documents of title, money orders, commercial paper, and other security instruments, documents, deposits and credits from time to time in the possession of Lender representing or evidencing such Accounts;

(e)    all earnings and investments held in any Account in accordance with this Agreement; and

(f)    to the extent not described above, any and all proceeds of the foregoing, (collectively, the "Loan Account Collateral").

This Agreement and the pledge, assignment and grant of security interest made hereby shall secure payment of all Obligations in accordance with the provisions set forth herein. This Agreement shall be deemed a security agreement within the meaning of the Uniform Commercial Code.

Borrower agrees to promptly execute, acknowledge, deliver, file or do, at its sole cost and expense, all acts, assignments, notices, agreements or other instruments as Lender may require in order to effectuate, assure, convey, secure, assign, transfer and convey unto Lender any of the rights granted by this Agreement and to protect any Lien confirmed or purported to be created hereby, or to enable Lender to exercise and enforce their rights and remedies hereunder, in respect of the Loan Account Collateral. If Borrower fails, after the giving of required notices, if any, and the expiration of applicable grace periods, if any, to perform any agreement or obligation contained herein, Lender may perform or cause the performance of such agreement or obligation, and the expenses of Lender incurred in connection therewith shall be payable to Lender by Borrower.

Nothing contained herein shall impair or otherwise limit Borrower's obligations to timely make the payments (including, without limitation, Debt Service) required by the Note and the other Loan Documents, it being understood that such payments shall be so timely made in accordance with the Loan Documents, regardless of the insufficiency of amounts on deposit in any Account for purposes of paying such sums.

**Section 4.6.** <u>Certain Matters Regarding Lender following an Event of Default.</u>

Following an Event of Default under the Loan and provided that the Senior Debt has been fully satisfied:

(a)     Borrower agrees that the Depository Bank shall pay over to Lender all amounts deposited in the Collection Account.

(b)     Lender may exercise in respect of the Loan Account Collateral all rights and remedies available to Lender hereunder or under the other Loan Documents, or otherwise available at law or in equity. Upon the occurrence and during the continuance of an Event of Default, Lender may exercise in respect of the Loan Account Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Uniform Commercial Code then in effect in the applicable jurisdiction.

(c)     Upon the occurrence and during the continuance of any Event of Default, Lender may, at any time or from time to time:

(i)     collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Loan Account Collateral, or any part thereof, without notice to Borrower or any other Person and without the need to institute any legal action, make demand to or upon Borrower or any other Person, exhaust any other remedies or otherwise proceed to enforce its rights;

(ii)     execute (in the name, place and stead of Borrower) any endorsements, assignments or other instruments of conveyance which may be required for the withdrawal and negotiation of the Loan Account Collateral; and/or

(iii)     exercise all other rights and remedies available to Lender hereunder and under any of the other Loan Document.

(d)     Notwithstanding anything to the contrary contained herein:

(i)     Borrower and each other Borrower Entity shall remain liable under the Loan Documents to the extent set forth herein and therein to perform all of its respective obligations thereunder, to the same extent as if this Agreement had not been executed;

(ii)     the exercise by Lender of any of its rights hereunder shall not release Borrower and each other Borrower Entity from its obligations under any of the Loan Documents, nor shall it constitute an election of remedies by Lender or a waiver by Lender of any of its rights and remedies under the Loan Documents;

(iii)     except as expressly set forth in this Agreement or in any of the other Loan Documents, Lender shall not have any obligation or liability by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Borrower or any Borrower Entity hereunder or to take any action, in each case, to collect or enforce any claim for payment assigned hereunder; and

23

(iv)    Lender shall not have to resort to using the Loan Account Collateral before making demand upon or bringing an action against Borrower or any other Borrower Entity under any Loan Document or under any guaranty given in connection with the Loan.

(e)    No failure on the part of Lender to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right under this Agreement or the other Loan Documents. The remedies provided in this Agreement, the Note and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

Section 4.7.  Representations and Warranties Regarding Loan Account Collateral.  In addition to any representations or warranties contained in this Agreement, Borrower represents and warrants as follows:

(i)    Borrower is the legal and beneficial owner of its respective Loan Account Collateral, free and clear of any Liens, except for the Liens in favor of Lender created by this Agreement and the other Loan Documents.

(ii)    Upon execution by Borrower of this Agreement, the pledge and assignment of the Loan Account Collateral pursuant to this Agreement will create a valid, second priority security interest in the Loan Account Collateral, securing the payment and performance of the Obligations.

Section 4.8.  Covenants Regarding Loan Account Collateral.  Except as otherwise permitted in this Agreement or any of the other Loan Documents, Borrower covenants to Lender that for so long as any of the Obligations remain outstanding, it will comply with or shall cause to be complied with, the covenants set forth below:

(a)    it will not, without the prior consent of Lender, (i) sell, assign (by operation of law or otherwise), pledge, or grant (or permit to be sold, assigned, pledged or granted) any option with respect to, any Available Cash (other than pursuant to the Senior Loan Documents) or any interest in the Loan Account Collateral or (ii) create or permit to exist any Lien upon or with respect to any Available Cash (other than pursuant to the Senior Loan Documents) or any Loan Account Collateral (other than pursuant to the Senior Loan Documents), except for the Liens in favor of Lender under this Agreement and the other Loan Documents;

(b)    it will give Lender not less than thirty (30) days' prior written notice of any change in the address of its chief executive office or its principal office;

(c)    all records with respect to the Loan Account Collateral will be kept at Borrower's principal office and will not be removed from such addresses without the prior written consent of Lender;

(d)    it will not make or consent to any amendment or other modification or waiver with respect to any Loan Account Collateral, or enter into any agreement, or permit to exist any restriction, with respect to any Loan Account Collateral, without the prior written consent of Lender;

24

(e)     Borrower will, at its expense, defend Lender's right, title and security interest in and to the Loan Account Collateral against the claims of any Person; and

(f)     no Borrower Entity will take any action which would in any manner impair the enforceability of this Agreement or the security interests created hereby.

**Section 4.9.** _Attorney-In-Fact._     Borrower hereby irrevocably appoints Lender, as its attorney in fact, coupled with an interest, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time during the continuance of an Event of Default but in all cases subject to the Senior Loan Documents and the rights of the holder of the Senior Debt, in the discretion of Lender, to take any action and to execute any instrument which Lender may deem necessary to accomplish the purpose of this Agreement or any other Loan Document, including, without limitation, the following: (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for monies due and to become due under or in respect of any of the Loan Account Collateral; (ii) to receive, endorse, and collect (A) Available Cash (subject to the terms of the Senior Loan Documents), (B) any instruments made payable to Borrower representing any dividend, payment of principal, interest, redemption price, purchase price or other distribution or payment in respect of any Loan Account Collateral, or (C) any other instruments, documents and chattel paper received in connection with this Agreement or any other Loan Document; (iii) to file any claims, or take any action or institute any proceedings which Lender shall deem necessary or desirable for the collection of Available Cash (subject to the terms of the Senior Loan Documents) in the event that Borrower shall fail to do so, or otherwise to enforce the rights of Lender with respect to this Agreement; (iv) to execute and/or file, without the signature of Borrower, any Uniform Commercial Code financing statements, continuation statements, or other filing, and any amendment thereof, relating to the Loan Account Collateral; (v) to give notice to any third parties which may be required to perfect Lender's security interest in the Loan Account Collateral; (vi) to register, purchase, sell, assign, transfer, pledge or take any other action with respect to any Loan Account Collateral in accordance with this Agreement or any Loan Document; and (vii) to register, purchase, sell, assign, transfer, pledge, or take any other action with respect to, any Loan Account Collateral in accordance with this Agreement or, to the extent applicable, any other Loan Document.  Lender shall notify Borrower of Lender's taking of any action as attorney in fact, or otherwise in Borrower's name, pursuant to the provisions of this Section 4.9.

**Section 4.10.** _Cash Management Fees._     All fees, costs and expenses (other than servicing fees or asset management fees, if any) associated with the Loan Account Collateral shall be paid by Borrower when due.

**Section 4.11.** _Substitute Cash Management Arrangements._     In the event that the Senior Debt shall have been satisfied prior to the payment in full of the Loan and all other amounts due hereunder being paid, subject to the terms of any new mortgage loan reasonably approved by Lender in accordance with the terms of the Loan Documents or otherwise, Borrower shall enter into a substitute cash management agreement and related lockbox and depository account agreements with substantially the same terms as are contained in the Senior Loan Documents within ten (10) days after the satisfaction of the Senior Debt.

25

**ARTICLE V**
CONDITIONS OF LENDING

**Section 5.1.** <u>Conditions Precedent to Disbursement of the Loan</u>.  The obligation of Lender to make the Loan hereunder is subject to the satisfaction of the following conditions precedent before or concurrently with the Closing Date:

(a)     <u>Authorization</u>.  Lender shall have received satisfactory evidence to verify, (i) the authority of the individual or individuals executing this Agreement and the other Loan Documents to bind Borrower and each other Borrower Entity and (ii) the authority of each individual who will sign the other statements, reports, certificates and documents and otherwise act on behalf of Borrower and each other Borrower Entity under the Loan Documents.

(b)     <u>Performance of Agreements; Truth of Representations and Warranties; No Injunction</u>.  Each Borrower Entity shall have performed in all material respects all agreements which any of the Loan Documents provide shall be performed on or before the Closing Date. The representations and warranties contained in the Loan Documents shall be true, correct and complete in all material respects on and as of the Closing Date to the same extent as though made on and as of that date.   No Legal Requirements shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued or entered, and no litigation shall be pending or threatened, which in the reasonable judgment of Lender would enjoin, prohibit or restrain, or impose or result in a material adverse effect upon the making, borrowing or repayment of the Loan or the execution, delivery or performance of the Loan Documents.  No Default or Event of Default shall have occurred and then be continuing.

(c)     <u>Loan Documents</u>.   Lender shall have received original counterparts of the following documents, in each case validly executed by the parties thereto:

(i)     the Note;

(ii)     an Indenture of Mortgage;

(iii)     the Financing Statements;

(iv)     the Equity Pledge Agreements;

(v)     the Environmental Indemnity; and

(vi)     the Intercreditor Agreement.

(d)     <u>Other Documents</u>. Lender shall have also received and approved the following additional documents from Borrower:

(i)     all certificates of insurance required pursuant to Section 6.2(f);

(ii)     A favorable opinion, dated as of the Closing Date, of counsel to Borrower and each other Borrower Entity, in form and substance satisfactory to Lender, as to:

(a)     the enforceability of the Loan Documents and in form appropriate to create Liens in favor of Lender (including the choice of law provisions); and

26

(b)    such other matters as Lender may reasonably request (other than a so-called non-consolidation opinion).

(iii)    a certificate, dated as of the Closing Date, from Borrower and the managing member of each other Borrower Entity that is not an individual (together with copies of the documents referred to below), certifying that attached thereto are true, correct and complete copies (including any amendments) of:

(a)    the Organizational Documents of such Borrower Entity and any managing member or general partner thereof;

(b)    the resolution(s) adopted by the board of managers of Borrower and the other Borrower Entities, authorizing the execution and delivery of the Loan Documents by such Borrower and each Borrower Entity;

(c)    an incumbency certificate containing the signatures of the officers of the managing member or general partner of such Borrower Entity; and

(d)    good standing certificates from the jurisdiction of formation of such Borrower Entity;

(iv)    the most recently prepared balance sheet of each Borrower in form and substance satisfactory to Lender in its sole discretion; and

(v)    such other documents, instruments, approvals as Lender may reasonably request, including, without limitation, the documents and other deliveries set forth in the Closing Checklist attached hereto as Schedule 15.

(e)    <u>Establishment of Collection Account</u>.    Borrower shall have established the Collection Account in accordance with the terms of the Senior Loan Documents or the terms set forth herein and in the Cash Management Agreement.

(f)    <u>Senior Loan Documents</u>.    A default or event of default shall not have occurred and be continuing under any of the Senior Loan Documents.

(g)    <u>Other Conditions Satisfied</u>.    Each of the other conditions precedent required to be satisfied, and each of the other documents to be delivered, on the Closing Date in accordance with the Loan Documents shall have been properly satisfied and delivered in accordance with the relevant provisions thereof.

(h)    <u>Origination Fee</u>.    Borrower shall have paid to Lender the Origination Fee, which shall be withheld from Loan proceeds otherwise payable to Borrower.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

**Section 6.1.** <u>Representations and Warranties of Borrower</u>.    Borrower represents and warrants as follows:

27

(a)     Each Borrower Entity (which is not an individual) is duly organized, validly existing and in good standing under the laws of its respective jurisdiction of formation and has all requisite power and authority (including, without limitation, all governmental licenses, permits and other approvals) to own or lease and operate its property and to carry on its business as now conducted and as proposed to be conducted.  The tax identification number of each Borrower Entity is set forth on Schedule 16 attached hereto.  The organization chart attached hereto as Schedule 17 correctly identifies Borrower and Pledgor and each Person directly owning (and/or indirectly owning five percent (5%) or more of) the ownership interests in Borrower or Pledgor, and accurately depicts the affiliation, if any, of each Borrower Entity.

(b)     The execution, delivery and performance by each Borrower Entity which is not an individual of its respective obligations under this Agreement, the Note and each other Loan Document, and the consummation of the other transactions contemplated herein, are within each Borrower Entity's limited liability or partnership or corporate powers, have been duly authorized by all necessary action and do not (i) contravene its Organizational Documents, (ii) violate any applicable Legal Requirements (including, without limitation, the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, Regulation X of the Board of Governors of the Federal Reserve System), (iii) conflict with or result in the breach of, or constitute a default under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, including, without limitation, any of the Senior Loan Documents binding on or affecting such Borrower Entity or its property, or (iv) require any approval or consent of any Person under the Senior Loan Documents, the Organizational Documents of any Borrower Entity, any Material Contracts or any other agreement or document to which such Person is a party or by which such Person or its property may be bound (except to the extent such approvals or consents have been unconditionally obtained on or before the Closing Date or the failure to obtain such approvals or consents would not be reasonably expected to result in a Material Adverse Effect upon Borrower).  No Borrower Entity is in violation of any applicable Legal Requirement or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, which, in each case, would be reasonably expected to result in a Material Adverse Effect.  Each of the representations and warranties contained in the Senior Loan Documents are true and correct in all material respects.  None of the covenants contained in the Senior Loan Documents or Material Contracts have been breached in any material respect and no material default exists thereunder.

(c)     No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by Borrower of this Agreement, the Note or any other Loan Document, or for the consummation of the transactions contemplated herein, (ii) the grant by Borrower and each Pledgor of the Liens granted by each pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created by the Collateral Documents (including the priority thereof) except for the filing of UCC 1 Financing Statements or (iv) the exercise by Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents (subject, however, to the rights of any lender under the Senior Loan Documents) to the extent that the exercise of Lender's rights would cause a default thereof.

(d)    This Agreement, the Note and each other Loan Document, when delivered, will have been, duly executed and delivered by each Borrower Entity which is a party thereto. This Agreement, the Note and each other Loan Document, when delivered, will be, the legal, valid and binding obligation of each Borrower Entity which is a party thereto, enforceable against such Borrower Entity in accordance with their respective terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting enforcement of creditors' rights generally and to the effect of general principles of equity.

(e)    To the best knowledge of the Borrower Entities, no information, exhibit or report furnished by any Borrower Entity to Lender in connection with the negotiation of the Loan Documents or pursuant to the terms of the Loan Documents contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein not misleading in any material respect.

(f)    There is no action, suit, investigation, litigation or proceeding affecting any Borrower Entity or their respective property or any Collateral pending or, to the best of Borrower's knowledge threatened, before any Governmental Authority, except as set forth on Schedule 18 (the "Disclosed Litigation").   The Disclosed Litigation is either covered by insurance or, if adversely determined, would not have a Material Adverse Effect.

(g)    No proceeds of the Loan will be used to acquire any equity security of a class that is registered pursuant to Section 12 of the Securities Exchange Act of 1934. No Borrower Entity has issued any unregistered securities in violation of the registration requirements of Section 5 of the Securities Act of 1933, as amended, or any other federal law or any state blue sky laws and is not and has not been in violation of any rule, regulation or requirement under the Securities Act of 1933, as amended, or the Securities and Exchange Act of 1934, as amended or any state blue sky laws.  No Borrower Entity is required to qualify any indenture under the Trust Indenture Act of 1939, as amended, in connection with the execution and delivery of the Note executed by Borrower, this Agreement and the other Loan Documents.

(h)    Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of the Loan will be used, directly or indirectly, to purchase or carry any Margin Stock, to extend credit to others for the purpose of purchasing or carrying any Margin Stock, or for the purpose of reducing or retiring any indebtedness which might cause any of the loans to be considered a "purpose credit" within the meaning of Regulation G, T, U or X of the Federal Reserve Board.

(i)    No Borrower Entity is and no Borrower Entity will be an "employee benefit plan" (as defined in Section 3(3) of ERISA), which is subject to Title I of ERISA, and the assets of the Borrower Entities do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA.

(j)    No Borrower Entity is and no Borrower Entity will be a "governmental plan" within the meaning of Section 3(32) of ERISA and transactions by or with any Borrower Entity are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.

(k)    Borrower is not (i) an "investment company," an "affiliated person" of, "promoter" or "principal" underwriter for or a company "controlled" by an "investment

29

company," within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (iii) subject to any other Law that purports to restrict or regulate its ability to borrow money. The making and funding of the Loan by Lender, the application of the proceeds and repayment thereof by Borrower and the consummation of the transactions contemplated herein and the other Loan Documents will not violate any Law, including, without limitation, any provision of such Act or any rule, regulation or order issued by the Securities and Exchange Commission thereunder. No Borrower Entity or any of their respective Affiliates are, and shall not become, a Person with whom Lender is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or other governmental action relating to terrorism financing, terrorism support and/or otherwise relating to terrorism and are not and shall not engage in any dealings or transaction or otherwise be associated with Persons named on OFAC's Specially Designated and Blocked Persons list.

(l)     All tax returns and reports of each Borrower Entity required to be filed by such Persons have been timely filed, and all taxes, assessments, fees and other governmental charges upon such Person, the Collateral or the Property which are due and payable or which have been levied, imposed or assessed have been paid in full, together with any applicable interest or penalties. No tax returns of any Borrower Entity is under audit. No tax liens have been filed and, to Borrower's knowledge, no claims are being asserted with respect to any such taxes. The charges, accruals and reserves on the books of Borrower in respect of any taxes or other governmental charges are in accordance with GAAP. No Borrower Entity has given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of taxes. All tax returns filed by (or that include on a consolidated basis) each Borrower Entity are true, correct and complete.

(m)     Each Borrower Entity is Solvent.

(n)     Borrower's principal place of business and chief executive office is at the address set forth on page 1 of the Agreement.

(o)     No bankruptcy, reorganization or insolvency proceedings are pending or contemplated either by any Borrower Entity, or, to the best knowledge of each Borrower Entity, against Borrower, or any other Borrower Entity.

(p)     Borrower is a sophisticated owner, developer and investor in real estate and its decision to enter into the Loan is based upon its own independent evaluation of the terms, covenants, conditions and provisions of the Loan Documents and such other matters, materials and market conditions and criteria which Borrower deemed relevant. Borrower and each other Borrower Entity has not relied in entering into this Agreement, the Loan or the other Loan Documents upon any oral or written information, representation, warranty or covenant from Lender, or any of its representatives, employees, Affiliates or agents other than the representations and warranties, if any, of Lender contained in the Loan Documents. Borrower

and each other Borrower Entity further acknowledges that no employee, agent or representative of Lender has been authorized to make, and that no Borrower Entity relied upon any statements, representations, warranties or covenants other than those specifically contained in this Agreement and the other Loan Documents.

(q)    All financial statements of each Borrower Entity, and with respect to the Property delivered to Lender on or prior to the Closing Date are itemized on Schedule 19 attached hereto and are true, complete and correct and, fairly present, in accordance with the Accounting Rules, the financial condition of the applicable Person or Property as of the respective dates of such statements and there has been no material adverse change that would have a Material Adverse Effect since such dates.

(r)    As of the Closing Date (i) Borrower has no Debt other than Permitted Debt, and (ii) Borrower has no Subsidiaries.

(s)    Borrower represents and warrants that there is no pledge of any ownership interest in Borrower except in favor of Lender.

(t)    Qualifications as Real Estate Operating Company.

(i)    As of the date of Borrower's first long-term investment that was not a short-term investment of funds pending long-term commitment, i.e., _____, 2006 (the "REOC Qualification Date"), and continuously thereafter through and including the Closing Date, at least fifty percent (50%) of the assets of Borrower (other than short-term investments pending long-term commitment or distribution of investors), valued at cost, have been invested in real estate which has been under active development or management by Borrower.

(ii)    Borrower has been actively engaged in the management or development of real estate in the ordinary course of its business at all times from the REOC Qualification Date to and including the Closing Date.

(iii)    Borrower will comply with all requirements, and take all action and cause its Subsidiaries to take all actions necessary, to maintain its status as a "real estate operating company" as such term is defined in 29 C.F.R. §2910.3-101. Borrower covenants that it has or it will establish an "annual valuation period," which will be an annual period of no more than 90 days that will begin no later than the anniversary of the REOC Qualification Date.

**Section 6.2.** Additional Representations and Warranties.

(a)    No Material Adverse Change. Since December 31, 2006 to the Closing Date, no event or change has occurred that has caused or evidences, either individually or together with such other events or changes, a Material Adverse Effect with respect to Borrower or any Borrower Entity.

(b)    Title to Property; Liens; Zoning; Contracts; Condition of the Property.

(i)    Borrower has fee simple title to the Property, subject only to the Permitted Encumbrances. Except for the Permitted Encumbrances, the Property, to the extent

acquired, is free and clear of Liens. There are no outstanding claims and all work, services or materials the provision of which might ripen into a claim have been fully paid for or will be in the ordinary course of business. Except for the Permitted Encumbrances, there are no delinquent ground rents, assessments for improvements or other similar outstanding charges or Impositions affecting the Property. No improvements lie outside the boundaries and building restriction lines of the Property or encroach onto any easements to any extent, and no improvements on adjoining properties encroach upon the Property to any extent which, in each case, would materially interfere with the development and sale of the Property consistent with the Approved Business Plan. The Permitted Encumbrances do not and will not materially interfere with the development and sale of the Property consistent with the Approved Business Plan. Borrower will preserve its right, title and interest in and to the Property for so long as the Obligations remain outstanding and will warrant and defend same from and against any and all claims whatsoever other than the Permitted Encumbrances.

(ii)     A true, accurate and complete description of the entitlement status for the Property and a time frame for completion of obtaining all entitlements for the Property necessary to complete the development of the Approved Infrastructure and the sale of the Property pursuant to the Approved Development Plan is set forth on Schedule 20 attached hereto (the "Entitlement Schedule"). Upon obtaining all of the entitlements identified on the Entitlement Schedule, Borrower will have the unconditional and vested right to develop and sell the Property consistent with the Approved Business Plan. The Entitlement Schedule is true, correct and complete in all material respects. To the best knowledge of Borrower, the Property is in full compliance with, all applicable zoning, subdivision, land use and other Legal Requirements. No legal proceedings are pending or, to Borrower's knowledge threatened, with respect to the compliance of the Property with Legal Requirements. Neither the zoning nor any other right to construct, use or operate or sell the Property consistent with the Approved Business Plan is in any way dependent upon or related to any real estate other than the Property and validly created, existing appurtenant perpetual easements insured in Borrower's title policy or use of public rights of way.

(iii)     Except as set forth on Schedule 21 attached hereto, all licenses and permits necessary to commence the development of the Property consistent with the Approved Business Plan and to comply with any Material Contract are currently in full force and effect other than the failure to possess licenses which would have a Material Adverse Effect. Borrower has not received any written notice of any violation of any such licenses, permits, authorizations, registrations or approvals. A listing of all currently effective permits applicable to the Property is set forth on Schedule 21.

(iv)     Borrower has provided Lender with true and complete copies of all Material Contracts and the Senior Loan Documents. Borrower is not a party to and Borrower, the Property and the Collateral are not bound by any material agreement, document or instrument other than the Loan Documents, the Senior Loan Documents, the Permitted Encumbrances, the other Material Contracts, if any, and such party's Organizational Documents, true, correct and complete copies of which have been delivered to Lender. Except for the Loan Documents and the Senior Loan Documents, Borrower is not a party to or bound by, nor is any of their respective property subject to or bound by, any contract or other agreement which restricts its ability to conduct business in the ordinary course or, either individually or in the aggregate, has a Material Adverse Effect or could reasonably be expected to have a Material Adverse Effect, in

32

each case with respect to Borrower. Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Material Contract which could have a Material Adverse Effect. To the knowledge of Borrower, no Default, Event of Default, default under the Senior Debt and no fact, circumstance, condition or event has occurred or exists which might within the giving of notice and/or the expiration of an applicable grace or curative period, ripen into such a default. Except for the Senior Loan Documents and the Loan Documents, Borrower is not subject to any restriction or limitation on its ability to distribute funds to its owners and there are no restrictions on Borrower from distributing funds to its respective owners.

(v)    To the knowledge of Borrower, there are no latent or patent defects or deficiencies in any of the land comprising the Property which could materially impair the construction of the Approved Infrastructure Improvements and the development of the Property consistent with the Approved Business Plan. Except as set forth on the plat of survey delivered to Lender, no part of the Property is within a flood plain or in a flood hazard area as defined by the Federal Insurance Administration. The Property has legally adequate contiguous rights of access to public ways.

(c)    Real Estate Taxes. Except for the Permitted Encumbrances and as disclosed on Schedule 23, there are no pending or, to the knowledge of Borrower proposed, special or other assessments for public improvements or otherwise affecting the Property, nor, to Borrower's knowledge, are there any contemplated improvements to the Property that may result in such special or other assessments. Borrower has provided Lender with true, correct and complete copies of all bills and invoices for Impositions which have been levied or assessed against or are outstanding with respect to all of the Property. Borrower has provided Lender with a true, correct and complete schedule of the assessment of the Property in effect as of the Closing Date. Borrower has not received any notice that any portion of the Property has been re assessed or is currently the subject of a reassessment. No portion of any of the Property is exempt from taxation or constitutes an "omitted" tax parcel. No Impositions are currently delinquent or outstanding with respect to the Property. No tax contests of any Impositions or assessments are currently pending. The land and improvements comprising the Property constitute a separate tax lot or lots, with a separate tax assessment or assessments independent of any other land or improvements not constituting a part of any of the Property and no other land or improvements is assessed and taxed together with any portion of any of the Property.

(d)    Insurance. Schedule 24 sets forth a list of the insurance policies under which the Property are insured and a complete and accurate description of all policies of insurance that will be in effect as of the Closing Date for Borrower and the Property, and such policies of insurance satisfy all of the requirements of this Agreement and the Senior Loan Documents. No notice of cancellation has been received with respect to such policies and Borrower and the Property are in compliance, in all material respects, with all conditions contained in such policies.

(e)    Budget. The Approved Budget submitted to Lender for the Property is a true, correct and complete copy of the Budget in effect on and as of the Closing Date. The Approved Budget and all of the amounts set forth therein, present a true, full and complete line itemization (by category for the fiscal year to which such Annual Budget applies) of: (i) all reasonably estimated Available Cash; and (ii) all reasonably estimated costs and expenses necessary to construct the Approved Infrastructure Improvements consistent with the Plans and Specifications and all other costs and expenses necessary to complete the development and sale of the Property

33

consistent with the Approved Business Plan. No material capital expenditures with respect to the Property are being incurred, contemplated or are reasonably necessary, except as specified in the Approved Budget.

(f)   Finder's Fee.   The Borrower Entities represent that none of them have used or dealt with a finder or broker, or otherwise agreed to have any commission or fee paid by a finder or broker, in connection with this transaction, other than Wall Street Advisors and Exeter Capital Partners (collectively, the "Broker"), whose commissions shall be paid by Lender pursuant to a separate agreement. The Borrower Entities shall hold Lender and any other holder of the Loan harmless against, any liability, loss or expense (including, without limitation, reasonable attorneys' fees and out of pocket expenses) arising in connection with any claim for any commission, fee or other compensation, except to the extent such liability, loss or expense is related to a claim by the Broker or directly caused by Lender or any of its managers, members, officers, employees, representatives or agents. Lender shall hold the Borrower Entities harmless against, any liability, loss or expense (including, without limitation, reasonable attorneys' fees and out of pocket expenses) arising in connection with any claim for any commission, fee or other compensation payable to Broker, except to the extent such liability, loss or expense is directly caused by any Borrower Entity or any of its respective managers, members, officers, employees, representatives or agents.

(g)   Relationships with Affiliates.   Except as set forth on Schedule 25, no Affiliate of Borrower presently has any interest in the Property (whether real, personal, or mixed and whether tangible or intangible) used in or pertaining to the businesses of Borrower.

(h)   No Restrictions under the Senior Loan Documents.   No provision of the Senior Loan Documents prevents or restricts, or will prevent or restrict, except upon an Event of Default (as defined in the Senior Loan Documents), the ability of Borrower or any other Borrower Entity to meet its obligations hereunder, including, without limitation, the timely payment of principal and interest due under the Note.

(i)   Environmental.   There are no claims, liabilities, investigations, litigation, administrative proceedings, whether pending or, to Borrower's knowledge threatened, or judgments or orders relating to any Hazardous Materials (collectively called "Environmental Claims") asserted or, to Borrower's knowledge, threatened against Borrower, any predecessor owner, tenant or operator or relating to any real property currently or formerly owned, leased or operated by Borrower including the Property. Except as disclosed in the Environmental Reports, to Borrower's knowledge, Borrower has not caused or permitted any Hazardous Material to be used, generated, reclaimed, transported, released, treated, stored or disposed of in a manner which could form the basis for an Environmental Claim against Borrower. Except as disclosed in the Environmental Reports, to Borrower's knowledge, no Hazardous Materials in violation of applicable Environmental Laws are or were stored or otherwise located, and no underground storage tanks or surface impoundments are or were located, on real property currently or formerly owned, leased or operated by Borrower , including the Property, or to the knowledge of Borrower, on adjacent parcels of real property, and no part of such real property or, to the knowledge of Borrower, no part of such adjacent parcels of real property, including the groundwater located thereon, is presently contaminated by Hazardous Materials in violation of applicable Environmental Laws or to any extent which has, or might reasonably be expected to have, a Material Adverse Effect. Except as disclosed in the Environmental Reports, to Borrower's knowledge, Borrower and the Property have been and are currently in compliance

34

with all applicable Environmental Laws, including obtaining and maintaining in effect all permits, licenses or other authorizations required by applicable Environmental Laws.

(j)    Intellectual Property.  Schedule 26 sets forth a true, correct and complete list of all of the patents, trademarks, tradenames, technology, other intellectual property rights and other Proprietary Rights used in the ownership, operation and management of the business of Borrower.  Borrower possesses, owns or has valid licenses, permits, certificates of public convenience, service marks, authorizations, patents, patent rights or licenses, trademarks, trademark rights, trade name rights, trade styles, trade dress, logos and other source or business affiliation identifiers, and copyrights, certificates, consents, orders, approvals and other authorizations from, and have made all declarations and filings with, all federal, state, local and other Governmental Authority, all self regulatory organizations and all courts and other tribunals (collectively, together with the goodwill associated therewith, "Proprietary Rights") presently required or necessary to own or lease, as the case may be, and to operate, its respective properties and to carry on their respective businesses as now conducted in accordance with the Approved Budget and Approved Business Plan.  Borrower has fulfilled and performed all of their respective obligations with respect to such permits, and no event has occurred which allows, or after notice or lapse of time would allow, revocation or termination thereof or could result in any other material impairment of the rights of the holder of any such permit; and Borrower has not received any notice of any proceeding relating to unenforceability, invalidity, revocation or modification of any Proprietary Rights.  Borrower has not received any notice that any Proprietary Rights have been declared unenforceable or otherwise invalid by any court or Governmental Authority.  Borrower has not received any notice of infringement of, or conflict with, and Borrower does not know of any such infringement of or conflict with, asserted rights of others with respect to any Proprietary Rights.

(k)    Representations Remade.  Borrower warrants and covenants that the foregoing representations and warranties will be true and shall be deemed remade as of the date of the Closing and as of the date of each other advance of Loan proceeds pursuant to the Agreement. All representations and warranties made in the other Loan Document or in any certificate or other document delivered to Lender by or on behalf of Borrower pursuant to the Loan Documents shall be deemed to have been relied upon by Lender, notwithstanding any investigation made by or on behalf of Lender.  All such representations and warranties shall survive the making of the Loan and any or all of the advances of the Loan and shall continue in full force and effect until such time as the Loan has been paid in full.

**Section 6.3.**  Representations and Warranties of each Guarantor.  Each Guarantor represents that (in each case, on such Guarantor's part and not on the part of the other Guarantors):

(a)    The execution, delivery and performance by such Guarantor of this Agreement and supporting documents executed or to be executed by such Guarantor is within such Guarantor's power;

(b)    Except for those that have been duly obtained or made and are in full force and effect, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or other Person is required for the due execution, delivery or performance by such Guarantor of this Agreement, or any other Loan Document to which it is a party.

35

(c)    The financial statements delivered to lender by such Guarantor have been prepared in accordance with GAAP consistently applied, and present fairly the financial condition of such Guarantor as at the date thereof.

(d)    To the knowledge of such Guarantor, no labor controversy, litigation, arbitration or governmental investigation or proceeding is pending or threatened, against Borrower which would reasonably be expected to materially adversely affect the financial condition, operations, assets, business or properties of such Guarantor, or which purports to affect the legality, validity or enforceability of this Agreement.

(e)    No judgments or orders for the payment of money has been rendered against such Guarantor.

(f)    All information furnished by or on behalf of such Guarantor to Lender for purposes of or in connection with this Agreement or any transaction contemplated hereby and all other such information hereafter furnished by or on behalf of Guarantors to Lender pursuant to the terms of this Agreement will be, true and accurate in every material respect on the date as of which such information is dated or certified and as of the date of execution and delivery of this Agreement by Lender and such information is not, or shall not be, as the case may be, incomplete by omitting to state any material fact necessary to make such information not misleading. Insofar as any of the information described above includes assumptions, estimates, projections or opinions, no representation or warranty is made herein with respect thereto; provided, however, that to the extent any such assumptions, estimates, projections or opinions are based on factual matters, such Guarantor has reviewed such factual matters and nothing has come to such Guarantor's attention in the context of such review which would lead such Guarantor to believe that such factual matters were not or are not true and correct in all material respects or that such factual matters omit to state any material fact necessary to make such assumptions, estimates, projections or opinions not misleading in any material respect.

## ARTICLE VII
## COVENANTS

### Section 7.1. Affirmative Covenants.

(a)    Payment of Impositions, Etc.    Each Borrower Entity shall pay and discharge before the same shall become delinquent, (i) all taxes, assessments, claims, governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon any of its property;

(b)    Preservation of Existence, Etc.    Each Borrower Entity shall preserve and maintain in full force and effect its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, trademarks, approvals, privileges and franchises.

(c)    Keeping of Books.    Each Borrower Entity shall keep proper books of record and account in which full and correct entries shall be made of all financial transactions and its assets and business in accordance with the Accounting Rules.

(d)    ERISA.    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Lender, that

36

(i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true for Borrower: (a) equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2); (b) less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or (c) Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101 (c) or (e) or an investment company registered under the Investment Company Act of 1940, as amended.

(e)    Insurance. Borrower shall at all times cause to be provided, maintained and kept in force or cause to be provided, maintained and kept in force, at no expense to Lender, the policies of insurance with respect to the Property and Borrower required pursuant to the Senior Loan Documents.

(1)    All insurance policies required pursuant to this Agreement shall be endorsed to provide that: (i) Lender, its successors, and/or assigns, is named as additional named insured on all liability coverage, with the understanding that any obligation imposed upon the insureds (including the liability to pay premiums) shall be the sole obligation of Borrower and not of any other insured; (ii) the interests of Lender shall not be invalidated by any action or inaction of Borrower or any other Person, and such policies shall insure Lender regardless of any breach or violation by Borrower or any other Person of any warranties, declaration or conditions in such policies; (iii) the insurer under each such policy shall waive all rights of subrogation against Lender, any right to set-off and counterclaim and any other right to deduction, whether by attachment or otherwise; (iv) such insurance shall be primary and without right of contribution of any other insurance carried by or on behalf of Lender or Senior Lender; (v) if such insurance is canceled for any reason whatsoever, including nonpayment of premium or, if any substantial modification, change or reduction is made in the coverage which affects the interests of Lender, such cancellation, modification, change or reduction in coverage shall not be effective as to Lender until ten (10) days after receipt by Lender of written notice sent by registered mail from such insurer; (vi) any such insurance shall be endorsed to provide in as much as the policy is written to cover more than one insured, all terms, conditions, insuring agreements and endorsements with the exception of limits of liability, shall operate in the same manner as if there were a separate policy covering each insured; and (vii) if required by Lender, such insurance shall contain "cut-through" endorsements providing direct access to any re-insurers, to the extent commercially available.

(2)    Borrower shall deliver to Lender a copy of each insurance policy with further evidence of such insurance acceptable to Lender, together with a copy of the declaration page for each such policy. Renewal certificates and copies of policies should be provided no later than fifteen (15) days prior to the expiration of each policy. Borrower shall deliver a copy of renewed policy or policies, or duplicate original or originals thereof, marked "premium paid," or accompanied by such other evidence of payment satisfactory to Lender with standard non-contributory mortgagee clause in favor of and acceptable to Lender. Upon request of Lender, Borrower shall cause its insurance underwriter or broker to certify to Lender in writing that all the requirements of this Agreement governing insurance have been satisfied. Borrower shall comply promptly with and conform to or cause prompt compliance and conformity with (i) all

provisions of each such insurance policy and (ii) all requirements of the insurers applicable to Borrower as respects use, occupancy, possession, operation, maintenance, alteration or repair of the Property. Borrower shall not permit the use of the Property in any manner that would permit any insurer to cancel any insurance policy or void coverage required to be maintained by this Agreement. No insurance policy may provide for assessments to be made against Lender or any Person servicing the Loan on behalf of Lender. If a policy permits assessments against others, such policy must waive any right to a Lien upon the Property and the Collateral and no such assessments may result in a Lien against the Property or the Collateral. The insurance coverage required under this Section may be effected under a blanket policy or policies covering the Property and other properties and assets not constituting a part of the Property; provided that any such blanket policy shall specify the portion of the total coverage of such policy that is allocated to the Property, and any sublimits in such blanket policy applicable to the Property, which amounts shall not be less than the amounts required pursuant to this Section and which shall in any case comply in all other respects with all of the requirements of this Section. Borrower shall comply (or cause compliance) with all insurance requirements and shall not bring or keep or permit to be brought or kept any article upon the Property or cause or permit any condition to exist thereon which would be prohibited by any insurance requirement, or would invalidate insurance coverage required hereunder. Borrower will not take out separate insurance contributing in the event of loss with that required to be maintained pursuant to this Section unless such insurance complies with this Section. All insurance policies shall be in form, with endorsements, risk coverage, deductibles and amounts and maintained with companies approved by Senior Lender or Lender, such approval not to be unreasonably withheld or delayed. Without limiting Lender's ability to approve the aforementioned, an insurance company shall not be reasonably satisfactory unless such insurance company is licensed or authorized to do business, as required under applicable law, in the jurisdiction where the Property is located. It is acknowledged and agreed that the companies providing the insurance in place on the date hereof (the "Existing Carriers") are approved by Lender and that all companies providing insurance from and after the date hereof shall have a claims paying abilityof no less than that of the Existing Carriers or otherwise acceptable to Senior Lender or reasonably acceptable to Lender. All insurance policies insuring against casualty, rent loss and business interruption and other appropriate policies shall provide that no claims be paid thereunder without twenty (20) days advance written notice to Lender. Lender shall not, by the fact of approving, disapproving, accepting, preventing, obtaining or failing to obtain any insurance, incur any liability for or with respect to the amount of insurance carried, the form or legal sufficiency of insurance contracts, solvency of insurance companies, or payment or defense of lawsuits, and Borrower hereby expressly assumes full responsibility therefore and all liability, if any, with respect thereto. If Borrower fails to provide to Lender the policies of insurance required by this Section or any other Loan Documents, Lender may (but shall have no obligation to) procure such insurance or single-interest insurance for such risks covering Lender's interest and Borrower will pay all premiums thereon promptly upon demand by Lender, and until such payment is made by Borrower, the amount of all such premiums shall bear interest at the Default Rate and shall constitute additions to the Obligations.

(f)    <u>Material Contracts</u>.  Borrower shall (i) perform, in all material respects, its obligations under, and enforce all monetary and any other material terms of, any Material Contracts using commercially reasonable judgment on an arm's length basis and (ii) deliver to Lender copies of any notices received or sent by any party under any Material Contract.

(g)     Permitted Debt.  Borrower shall (i) comply, in all material respects, with the terms and conditions of any Permitted Debt and (ii) deliver to Lender copies of notices received or sent by any party with respect to, or under, any Permitted Debt.

(h)     Lender's Additional Consent Rights.  In addition to other approval or consent rights of Lender as set forth herein, at all times obtain Lender's consent to the following material actions of Borrower: (a) refinancing of any mortgage loan or transfer of the Property (other than Permitted Debt for which consent is not required and Permitted Equity Transfers) in any manner that is inconsistent or materially different from the Approved Budget or Approved Business Plan, (b) modifying, in any material respect, any of the Senior Loan Documents except as permitted under the Intercreditor Agreement.  Lender agrees to be reasonable when considering requests to consent to the matters described above.

(i)     Environmental Compliance.  Borrower shall:  (a) comply at all times with all applicable Environmental Laws in all material respects, and (b) promptly take, or cause to be taken, any and all necessary remedial actions upon obtaining knowledge of the presence, storage, use, disposal, transportation, release or discharge of any Hazardous Materials on, under or about the Property.  Borrower shall cause all remedial action with respect to Hazardous Material on, under or about the Property, to comply with all applicable Environmental Laws and the applicable policies, orders and directives of all federal, state and local Governmental Authorities.  If Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Law by, or any liability arising thereunder of, Borrower or related to the Property, Borrower shall, upon request from Lender, provide Lender with such reports, certificates, engineering studies and other written material or data, in each case in the possession or control of any Borrower Entity, as Lender may reasonably require to confirm compliance by Borrower and the Property with all applicable Environmental Laws.  Upon reasonable prior notice and during regular business hours, except in the case of an emergency, Borrower shall permit Lender, its authorized representatives (including Blackacre Institutional Partners, LP), consultants or other Persons retained by Lender to enter upon, examine, perform non-intrusive testing and inspect the Property with regard to compliance with Environmental Laws, the presence of Hazardous Materials and the environmental condition of the Property and properties adjacent to the Land.  Such entry, examination, testing and inspecting and reporting shall be at the expense of Borrower if (x) an Event of Default has occurred and is continuing or (y) Lender has reasonably determined that there may be a violation of Environmental Law or any liability arising under Environmental Law, which expense shall be paid by Borrower to Lender upon demand.

(j)     Environmental Disclosure.  Borrower shall immediately upon becoming aware thereof advise Lender in writing and in reasonable detail of:  (1) any release, disposal or discharge of any Hazardous Material at the Property; (2) any and all written communications sent or received by Borrower or any of its agents with respect to any Environmental Claims or any release, disposal or discharge of Hazardous Material required to be reported to any federal, state or local governmental or regulatory agency; (3) any remedial action taken by Borrower or any other Person in response to any Hazardous Material on, under or about any real property owned, leased or operated by Borrower or its agents, the existence of which could result in an Environmental Claim; (4) the discovery by Borrower or any of its agents of any occurrence or condition on any real property adjoining or in the vicinity of the Property could cause such real property or any part thereof to be classified as "border zone property" or to be otherwise subject

39

to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws; and (5) any request for information from any Governmental Authority that indicates such Governmental Authority is investigating Borrower or another present or former occupant of the Property may be potentially responsible for a release, disposal or discharge of Hazardous Materials from the Property. Borrower shall promptly notify Lender of any proposed action to be taken by Borrower to commence any operations that could reasonably be expected to subject Borrower to additional laws, rules or regulations, including laws, rules and regulations requiring additional or amended environmental permits or licenses. Borrower shall, at its own expense, provide copies of such documents or information as Lender may reasonably request in relation to any matters disclosed pursuant to this Section 7.1(j).

(k)    <u>Compliance with Laws, Employee Benefit Plans and Contractual Obligations</u>. Borrower will promptly and faithfully (A) comply, in all material respects, with the requirements of all Legal Requirements and the orders and requirements of any Governmental Authority in all jurisdictions in which it is now doing business or may hereafter be doing business and of every board of fire underwriters or similar body exercising similar functions, in each case, with respect to which a Material Adverse Effect will result if Borrower were not in compliance, (B) maintain all licenses, certificates of occupancy, permits and Proprietary Rights now held or hereafter acquired by Borrower or with respect to which a Material Adverse Effect will result if same are not existing and held by Borrower and (C) perform, observe, comply and fulfill all of its respective material obligations, covenants and conditions contained in the Senior Loan Documents, the Loan Documents and the Material Contracts. Borrower shall: (i) promptly notify Lender of any claim made against Borrower or any other Borrower Entity that any such Person is in default under the Senior Loan Documents or any other Material Contract or that any other party is in default under any Material Contract; (ii) not terminate, or permit termination of, any Material Contract, and (iii) not enter into, amend or modify (or permit any Borrower Entity to enter into, amend or modify) any Material Contract, in each case with respect to items (ii) and (ii) above, in a manner that is inconsistent with or materially different from the Approved Budget or Approved Business Plan without first obtaining the prior written approval of Lender, which approval shall not be unreasonably withheld, delayed or conditioned. Borrower will not commence making contributions to any Employee Benefit Plan.

(l)    <u>Approved Business Plan and Approved Budget</u>. Borrower shall at all times comply, in all material respects, with the Approved Business Plan and Approved Budget, as revised from time to time pursuant to the provisions hereof.

(m)    <u>Further Assurances</u>. Borrower shall, from time to time, at its sole cost and expense, execute and/or deliver, or cause execution and/or delivery of, such documents, agreements and reports, and perform such acts as Lender at any time may reasonably request to carry out the purposes and otherwise implement the terms and provisions provided for in the Loan Documents. Borrower shall execute any documents and take any other actions necessary to provide Lender with a first or second priority, perfected security interest in the Collateral, as applicable. Borrower shall, at Borrower's sole cost and expense: (i) upon Lender's request therefore given from time to time (but not more frequently than once per calendar year unless an Event of Default then exists) pay for (a) current reports of Uniform Commercial Code, federal tax lien, state tax lien, judgment and pending litigation searches with respect to each Borrower Entity, (b) current good standing and existence certificates with respect to Borrower and (c) current searches of title to the Property, each such search to be conducted by search firms

40

reasonably designated by Lender in each of the locations reasonably designated by Lender; (ii) furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished pursuant to the terms of the Loan Documents; and (iii) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary, to evidence, preserve and/or protect the Collateral at any time securing or intended to secure the Obligations, as Lender may require in Lender's reasonable discretion. Borrower shall promptly execute, acknowledge, deliver, file or do, at its sole cost and expense, all acts, assignments, notices, agreements or other instruments as Lender may require in order to effectuate, assure, convey, secure, assign, transfer and convey unto Lender any of the rights granted by this Agreement and to more fully perfect and protect any assignment, pledge, lien and security interest confirmed or purported to be created under the Loan Documents or to enable Lender to exercise and enforce their rights and remedies hereunder, in respect of the Collateral.

(n)    <u>Construction Matters</u>. Without limitation of Lender's rights and Borrower's obligations set forth elsewhere in the Loan Documents, Borrower shall use commercially reasonable efforts to: (1) cause the construction of the Approved Infrastructure Improvements to proceed with reasonable diligence and continuously, with sufficient workers employed and sufficient materials supplied for that purpose so that the applicable construction is substantially completed by the dates described in the Approved Business Plan for the costs set forth in the Approved Budget, as the Approved Business Plan and Approved Budget are revised from time to time pursuant to the provisions hereof; (2) permit the Lender and its representatives (including, without limitation, the Construction Consultant and Blackacre Institutional Partners, LP) access to inspect the Property upon giving reasonable notice and, upon the written request of Lender, from time to time, to permit Lender to attend any and all meetings between any Contractor or any member of the Professional Team and Borrower in connection with the construction of the Approved Infrastructure Improvements, and deliver to the Lender promptly upon request copies of all minutes or other records of each such meeting and in general provide all reasonable assistance as requested by the Lender or the Construction Consultant which is necessary or desirable to enable the Construction Consultant to carry out its functions hereunder; (3) ensure that all funds drawn under the Senior Loan Documents will be applied in meeting those costs of the construction of the Approved Infrastructure Improvements in respect of which such drawing took place; (4) ensure that Lender and the Construction Consultant are provided with sufficient information to enable them to monitor the monthly reports delivered by Borrower to the holder of the Senior Debt; (5) notify Lender and the Construction Consultant as soon as practicable after it shall become apparent to Borrower that completion of the Approved Infrastructure Improvements will not be achieved by the date therefor contemplated in the Building Contract and notify the Lender of the reason for such delay; (6) submit to Lender and the Construction Consultant forthwith all master plans and specifications required to carry out the Approved Infrastructure Improvements and such other plans and specifications which the Construction Consultant may reasonably require for approval; (7) provide all financial and other information and assistance which Lender or the Construction Consultant may reasonably require to permit them to review and report on the progress of the Approved Infrastructure Improvements, including providing them with full and free access at all reasonable times to: (a) the Property and all buildings erected or being erected thereon; and (b) all plans, specifications and estimates of materials and services required, time and completion schedules and estimates of costs, and all approvals and certificates of and correspondence with any governmental or local authority in

41

connection with the Approved Infrastructure Improvements or otherwise and supplying copies thereof as required by Lender or the Construction Consultant; (8) comply in all material respects with each Building Contract and notify Lender and the Construction Consultant in writing forthwith of any material breach or event which with the giving of notice or lapse of time or both would constitute a material breach thereof; and (9) deliver to Lender and the Construction Consultant copies of all certificates of payment issued by Borrower's architect under any Building Contract or Construction Contract as soon as practicable after the issue thereof and promptly provide to the Construction Consultant on request all such other statements, certificates, site meeting notes, documents or information relating to any Building Contract or the construction of the Approved Infrastructure Improvements as Lender or the Construction Consultant may require. Borrower shall forward to Lender copies of all material written notices given or received by, or on behalf of, Borrower with respect to the construction of the Approved Infrastructure Improvements to or from:  (x) Contractor or any subcontractor or material supplier, or any of the design professionals (including notices relating to any nonconforming construction, any refusal or inability to pay or perform pursuant to the terms of any contract or other agreement or any delay, default or change order) or (y) any claim of default, or relating to any work stoppage, notice of violation or cease and desist order, stop order, construction liens, strike, claim, litigation, damage, loss or any other materially adverse condition, circumstance or event.  Borrower shall pay and discharge or cause to be paid and discharged promptly all payments due for labor, materials and supplies.  Within thirty (30) days after substantial completion of applicable construction activities, Borrower shall (i) complete, or cause to be completed, all punch-list items, (ii) deliver to Lender two (2) copies of the as built surveys as Lender may reasonably require and (iii) obtain all final required permits and approvals.

(o)    Consultation with Lender.  Except with respect to compliance with Environmental Laws and Hazardous Materials handling or disposal practices related to the Property, Lender shall have the following additional rights relating to the management of Borrower and the other Borrower Entities:  (i) the right to discuss the business operations, properties and financial and other condition of Borrower and the other Borrower Entities including significant business activities and business and financial developments of Borrower and the other Borrower Entities with such Person's respective officers, employees and directors; (ii) the right to submit proposals or suggestions to such Person's management from time to time or otherwise advise such Person's management with the requirement that such Person's management discuss such advice, proposals or suggestions with the Lender within a reasonable period after such submission considering them in good faith, in meetings which shall occur no less frequently than bi-monthly; (iii) the right to examine the books and records, operating reports, budgets and other financial reports of Borrower and the other Borrower Entities on a regular basis, and to visit and inspect Borrower's and the other Borrower Entities' facilities and to reasonably request information at reasonable times and intervals concerning the general status of Borrower's and the other Borrower Entities' financial condition and operations; (iv) the right to be notified of any material development to or affecting Borrower's and the other Borrower Entities' business and to consult with and advise management with respect to such matter; (v) the right to discuss with management of Borrower and the other Borrower Entities on the significant business issues involved in negotiating a plan of reorganization for Borrower and the other Borrower Entities, including management's proposed reorganization plans and operating plans for going forward after such plan of reorganization has been effected; and (vi) the right to request from Borrower and the other Borrower Entities in addition to the information provided pursuant to this Agreement, when available, copies of all financial statements, forecasts and projections provided to or approved by

42

Borrower's and the other Borrower Entities' management to its members and/or such other business and financial data as may be reasonably requested.

**Section 7.2.** Negative Covenants. So long as any portion of the Loan shall remain unpaid, Borrower will not, and will not cause or permit any Borrower Entity to, at any time:

(a) Debt. Create, incur, assume or suffer to exist, any Debt other than Permitted Debt.

(b) Accounting Changes. Make or permit any change in accounting policies or reporting practices, except as required by the Accounting Rules.

(c) Transfers. Cause, permit or suffer any Prohibited Equity Transfer or any other equity transfer other than a Permitted Equity Transfer.

(d) Negative Pledges. Enter into or suffer to exist any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets other than pursuant to the Loan Documents or in connection with the Permitted Debt.

(e) ERISA. Engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under this Agreement, the Note and the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(f) Affiliate Transactions. Borrower shall not directly or indirectly enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any director, officer, employee or Affiliate of any Borrower Entity, except (i) transactions in the ordinary course of and pursuant to the reasonable requirements of the business of Borrower and upon fair and reasonable terms and are no less favorable to Borrower than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate, director, officer or employee of any Borrower Entity, or (ii) as otherwise expressly contemplated by this Agreement. Each such agreement with any Affiliate, director, officer or employee of Borrower shall provide that the same may be terminated by Lender at its option if an Event of Default exists. Borrower covenants and agrees that the Deferred Development Fee shall not be paid for so long as the Loan remains outstanding.

(g) Fiscal Year. Change its Fiscal Year.

(h) Federal Reserve Board. Take or permit any agent acting on its behalf to use proceeds of the Loan, directly or indirectly, or take any other action which might cause this Agreement or any document or instrument delivered pursuant hereto to violate any regulation of the Federal Reserve Board or the Securities and Exchange Act of 1934, as amended, and any rules and regulations promulgated thereunder.

(i) Control of The Property. Cause, permit or suffer the day-to-day operations of the Property to be managed and controlled by any Person other than (i) Borrower or an entity Controlled, directly or indirectly, by Borrower or (ii) any other Person approved by Lender in its sole and absolute discretion.

43

(j)     Underwriting Standards.   Make any changes to its assumptions utilized in evaluating potential transactions without first notifying Lender, in writing, of such changes

(k)     Restriction on Fundamental Changes.  Borrower will not (and Borrower will not permit any Borrower Entity to): (1) amend, modify or waive in any material respect any term or provision of Borrower's Organizational Documents to the extent that such amendment modification or waiver would materially and adversely affect the interests of Lender in the Loan, (2) liquidate, wind up or dissolve Borrower (or suffer any liquidation or dissolution); or (3) acquire by purchase or otherwise all or any part of the business or assets of, or stock or other evidence of beneficial ownership of, any Person.  Borrower will not (and Borrower will not permit any Borrower Entity to) issue, sell, assign, pledge, convey, dispose or otherwise encumber any membership, beneficial or other ownership interests in Borrower or grant any options, warrants, purchase rights or other similar agreements or understandings with respect thereto, to the extent that such issuance, sale, assignment, pledge, conveyance, disposition or other encumbrance would materially and adversely affect the interests of Lender in the Loan or as except as may be required by the Senior Loan Documents.

(l)     Liens and Related Matters.   Borrower will not directly or indirectly create, incur, assume or permit to exist (or allow any Borrower Entity to directly or indirectly create, incur, assume or permit to exist) any Lien on or with respect to the Property or the Collateral whether now owned or hereafter acquired, or any income or profits therefrom, except Permitted Encumbrances.

(m)     Conduct of Business.   From and after the Closing Date, Borrower will not engage in any business other than ownership, management, development, leasing, operation, sale and financing of the Property.  Borrower shall not use the Property or any part thereof, or primarily allow the same to be used or occupied, for any purpose other than for the purposes of a mixed use real estate and development Project in compliance with Legal Requirements and consistent with the Approved Business Plan, or for any unlawful purpose.  Borrower will not suffer any act to be done or any condition to exist on the Property or any part thereof or any article to be brought thereon, which may be dangerous (unless safeguarded as required by Legal Requirement) or which may constitute a nuisance, public or private, or which may void or make voidable any insurance then in force with respect thereto.   No tract map, parcel map, condominium plan, condominium declaration, or plat of subdivision (or analogous document) that is materially inconsistent with or materially different from that contemplated in the Approved Budget or Approved Business Plan, as revised from time to time, will be recorded with respect to the Property without Lender's consent.  Borrower will not initiate or consent to (or permit any Borrower Entity to initiate or consent to) any change in the zoning of the Property, without the prior consent of Lender, which shall not be unreasonably withheld, delayed or conditioned.

(n)     Payments; Distributions.   Borrower shall not pay any distributions, dividends or other payments or return any capital to any of its respective partners, members, owners or shareholders or any other Affiliate or make any distribution of assets, rights, options, obligations or securities to any of its respective partners, members, shareholders or owners or any other Affiliate.

(o)     Intentionally Omitted.

44

(p)    <u>Approved Budget and Approved Business Plan</u>. Incur costs and expenses except pursuant to the Approved Business Plan and in an amount not greater than 105% of the amount provided therefor in the Approved Budget, as the Approved Business Plan and Approved Budget are revised from time to time pursuant to the provisions hereof.

(q)    <u>Management</u>  Borrower shall provide competent, responsible management for the Property.  All management agreements must contain subordination and termination provisions and must be otherwise satisfactory to Lender.  Borrower shall not enter into any management agreement or arrangement with any Person with respect to the management of the Property without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Borrower shall cause management subordination agreements in form and substance satisfactory to Lender to be executed by any manager of the Property.  Borrower shall not modify, amend or terminate any approved management agreement without Lender's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned. Borrower shall provide Lender with written notice of the occurrence of any event of default or condition which with the giving of notice or passage of time, or both, would constitute an event of default under any management agreement or which would entitle the manager to terminate the management agreement.   The management agreement shall be terminated by Borrower, at Lender's request, upon thirty (30) days' prior notice to Borrower (i) upon the occurrence of an Event of Default or (ii) if such manager commits any act which would permit termination by Borrower under such management agreement.   If manager is terminated pursuant hereto, Borrower shall immediately seek to appoint a replacement manager acceptable to Lender in Lender's reasonable discretion, and in the event Borrower fails to appoint an acceptable manager within sixty (60) days after Lender's request of such Borrower to terminate the management agreement, Lender may appoint a replacement manager acceptable to Lender in its sole discretion (subject to, the extent the Senior Debt remains outstanding, the consent of the holder of the Senior Debt pursuant to the Intercreditor Agreement).

**Section 7.3.**  <u>Reporting Requirements</u>.  So long as any portion of the Loan shall remain unpaid, Borrower will furnish to Lender:

(a)    <u>Default Notice</u>.  As soon as possible and in any event within five (5) days after obtaining knowledge of the occurrence of any Default under the Loan Documents, the Senior Loan Documents, any Material Contract or any event, development or occurrence reasonably likely to have a Material Adverse Effect, a statement from Borrower setting forth details of such Default, event, development or occurrence and the actions that Borrower or any other Borrower Entity has taken and proposes to take with respect thereto.

(b)    <u>Underwriting Model</u>.  No later than forty-five (45) days following the last day of any calendar quarter, Borrower shall deliver to Lender an update to its underwriting model which reflects then current information and assumptions.

(c)    <u>Quarterly Financials</u>.  As soon as available and in any event within forty five (45) days after the end of each quarter, (i) a balance sheet of Borrower on a consolidated basis as of the end of such quarter; (ii) a statement of income and a statement of cash flows of Borrower for the period commencing at the end of the previous quarter and ending with the end of such quarter; and (iii) a statement of income and a statement of cash flows of Borrower for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding

45

quarter of the preceding Fiscal Year, all in reasonable detail, and duly certified by Borrower. In addition, Borrower shall update Lender as to the status or any pending acquisitions.

(d)     Annual Financials. As soon as available and in any event within one hundred twenty (120) days after the end of each Fiscal Year, a balance sheet of Borrower on a consolidated basis as of the end of such Fiscal Year and a statement of income and a statement of cash flows of Borrower for such Fiscal Year, in the case of Borrower's financials, accompanied by an opinion acceptable to Lender from a firm of independent certified public accountants of recognized standing reasonably acceptable to Lender, and a certificate of the chief financial officer of Borrower stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that Borrower or any other Borrower Entity has taken and proposes to take with respect thereto. In addition, as soon as available and in any event within one hundred twenty (120) days after the end of each calendar year, a complete set of the Federal tax returns of Borrower.

(e)     Litigation. Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority, domestic or foreign, affecting any Borrower Entity.

(f)     Annual Budgets and Business Plans. Not later than December 1st of each calendar year, Borrower will deliver a then current Budget and a then current Business Plan (on a consolidated basis) to Lender for its review and approval. The annual Budget and Business Plan shall be prepared on a basis consistent with the prior year and shall be commercially reasonable. In the event that Lender reasonably objects to a proposed Budget or Business Plan submitted by Borrower, Lender shall advise Borrower of such objections within thirty (30) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Budget or Business Plan and resubmit the same to Lender. If Lender fails to object to a proposed Business Plan and/or Budget within 30 days after receipt thereof, such Business Plan and/or Budget shall be deemed to have been approved by Lender. Lender shall advise Borrower of any objections to such revised Budget or Business Plan within 15 days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Budget or Business Plan; provided that if Lender fails to object to a revised Business Plan and/or Budget within 10 days after receipt thereof, such revised Business Plan and/or Budget shall be deemed to have been approved by Lender. Until such time that Lender approves (or is deemed to have approved) a proposed Budget and Business Plan, which shall thereupon become the Approved Budget and Approved Business Plan for purposes hereof, the last year's Approved Budget (plus 5%) and Approved Business Plan shall apply; provided that, such Approved Budget and Approved Business Plan shall be adjusted to reflect actual increases in real estate taxes, insurance premiums, utilities expenses and any other items not within the discretion of Borrower. In the event Borrower desires to update an Approved Budget or Approved Business Plan more frequently it may do so with the prior written approval of Lender.; provided that if Lender fails to object to a modification to the Approved Business Plan and/or Approved Budget within 15 days after receipt thereof, such modification to the Approved Business Plan and/or Approved Budget shall be deemed to have been approved by Lender.

(g)     Other Information. (i)Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower as Lender

46

may from time to time reasonably request.; and (ii) upon request of Lender, each Guarantor shall furnish financial information reasonably requested by Lender to evaluate compliance with the financial covenants set forth in Section 7.4 below.

**Section 7.4.** Financial Covenants.

(a) Net Worth. Guarantors shall maintain a minimum combined net worth (exclusive of investment in the Property) of no less than $75,000,000.00; and

(b) Liquidity. Guarantors shall maintain minimum aggregate liquidity of no less than $30,000,000.00.

All calculations shall be based on the Financial Statements delivered by Borrower and Guarantors.

**Section 7.5.** Senior Debt Covenants.

(a) Without limiting anything to the contrary contained in Section 7.1 above, Borrower hereby covenants that it shall fully keep, perform and comply with (or cause to be kept, performed and complied with) each of the covenants set forth in the Senior Loan Documents, which are hereby incorporated by reference as if fully set forth herein(giving effect to any waiver or future amendment of such covenants by Senior Lender). Borrower acknowledges that the obligation to comply with such covenants is separate from, and may be enforced independently from, the obligations of Borrower under the Senior Loan Documents.

(b) In the event the Senior Debt shall at any time be repaid, or the liens securing the Senior Debt shall at any time be released in full, then unless and until the Note shall have been repaid in full and all obligations of Borrower to Lender hereunder and under the other Loan Documents shall have been satisfied, Lender shall possess the rights of consent and approval, rights to receive and control the disposition of casualty insurance proceeds and condemnation awards, and the right to collect rents through a lockbox and make waterfall distributions, in each case, on substantially the same terms as set forth in the Senior Loan Documents (but expressly excluding any rights and remedies relating to payment of the indebtedness under the Senior Loan Documents or relating to foreclosure, enforcement by power of sale or otherwise of Senior Lender's lien on the Property).

(c) Borrower shall deliver to Lender certified copies of any and all modifications to the Senior Loan Documents within five (5) Business Days after execution thereof.

(d) All financial information delivered or required to be delivered to Senior Lender pursuant to the terms of the Senior Loan Documents shall be contemporaneously delivered to Lender.

(e) Borrower shall deliver a true, correct and complete copy of all notices, demands, request or material correspondence (including electronically transmitted items) given or received by Borrower or Guarantor to or from the Senior Lender or its agents.

**Section 7.6.** Senior Debt Defaults.

47

(a)    Without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, if there shall occur any "Event of Default" under the Senior Loan Documents, Borrower hereby expressly agrees that Lender shall have the immediate right, without prior notice to Borrower, but shall be under no obligation: (i) to pay all or any part of the Senior Debt and any other sums that are then due and payable, and to perform any act or take any action on behalf of Borrower as may be appropriate, to cause all of the terms, covenants and conditions of the Senior Loan Documents on the part of Borrower to be performed or observed thereunder; and (ii) to pay any other amounts and take any other action as Lender, in its sole and absolute discretion, shall deem advisable to protect or preserve the rights and interests of Lender in the Loan and/or the Collateral.  All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section 7.6 (including reasonable attorneys' fees) (i) shall constitute additional advances of the Loan to Borrower, (ii) shall increase the then unpaid principal amount of the Loan, (iii) shall bear interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender, (iv) shall constitute a portion of the Obligations, and (iv) shall be secured by the Pledge and the other Collateral.

(b)    Borrower hereby indemnifies Lender from and against all liabilities, obligations, losses, damages, penalties, assessments, actions, or causes of action, judgments, suits, claims, demands, costs, expenses (including reasonable attorneys' and other professional fees, whether or not suit is brought, and settlement costs) and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Lender as a result of the foregoing actions.  Lender shall have no obligation to Borrower or any other party to make any such payment or performance.  Borrower shall not impede, interfere with, hinder or delay, and Borrower shall not permit any Borrower Entity to impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any default or asserted default under the Senior Debt, or to otherwise protect or preserve Lender's interests in the Loan and the Collateral following a default or asserted default under the Senior Debt.

(c)    Any default or breach by Borrower under the Senior Loan Documents which is not cured prior to the expiration of any applicable grace, notice or cure period afforded to Borrower under the Senior Loan Documents shall constitute an Event of Default, without regard to any subsequent payment or performance of any such obligations by Lender.  Borrower shall grant Lender and any Person designated by Lender the right to enter upon the Property at any time following the occurrence and during the continuance of any Event of Default under the Senior Loan Documents, or the assertion by the lender under the Senior Loan Documents that an Event of Default has occurred under the Senior Loan Documents, for the purpose of taking any such action or to appear in, defend or bring any action or proceeding to protect Borrower's and/or Lender's interest.  Lender may take such action as Lender deems reasonably necessary or desirable to carry out the intents and purposes of this subsection (including communicating with the lender under the Senior Loan Documents with respect to any Senior Debt defaults), without prior notice to, or consent from, Borrower.  Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender.

(d)    If Lender shall receive a copy of any notice of default under the Senior Loan Documents sent by the lender under the Senior Loan Documents to Borrower, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.  As a material inducement to Lender's making the Loan,

48

Borrower hereby absolutely and unconditionally releases and waives all claims against Lender arising out of Lender's exercise of its rights and remedies provided in this Section 7.6, except for Lender's gross negligence or willful misconduct. In the event that Lender makes any payment in respect of the Senior Debt, Lender shall be subrogated to all of the rights of the lender under the Senior Loan Documents under the Senior Loan Documents against the Property, in addition to all other rights it may have under the Loan Documents.

Section 7.7. <u>Acquisition of the Senior Debt</u>. No Borrower Entity nor any Affiliate of any of them shall acquire or agree to acquire the Senior Debt or any portion thereof or any interest therein, or any direct or indirect ownership interest in the holder of the Senior Debt, via purchase, transfer, exchange or otherwise, and any breach or attempted breach of this provision shall constitute an Event of Default hereunder. If, solely by operation of applicable subrogation law, any Borrower Entity or any Affiliate of any of them shall have failed to comply with the foregoing, then Borrower: (i) shall promptly notify Lender of such failure; (ii) shall cause any and all such prohibited parties acquiring any interest in the Senior Loan Documents: (A) not to enforce such loan documents; and (B) upon the request of Lender, to the extent any of such prohibited parties has or have the power or authority to do so, to promptly: (1) cancel any promissory note evidencing the Senior Debt, (2) reconvey and release the lien securing the Senior Debt, and any other collateral under the applicable loan documents, and (3) discontinue and terminate any enforcement proceeding(s) under the applicable loan documents.

Section 7.8. <u>Intercreditor Agreement</u>. Borrower hereby acknowledges and agrees that any intercreditor agreement entered into between Lender and the lender under the Senior Loan Documents (as amended from time to time, the "Intercreditor Agreement") will be solely for the benefit of Lender and the lender under the Senior Loan Documents , and that Borrower shall not be an intended third party beneficiary of any of the provisions therein, shall have no rights thereunder and shall not be entitled to rely on any of the provisions contained therein. Lender and the lender under the Senior Loan Documents shall have no obligation to disclose to Borrower the contents of the Intercreditor Agreement. Borrower's obligations hereunder are and will be independent of such Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof. In the event the Senior Debt shall at any time be refinanced with Lender's prior written consent, which consent may be granted or withheld in its reasonable discretion, Lender agrees to enter into and Borrower agrees to cause any replacement lender to enter into a replacement intercreditor agreement reasonably acceptable to all lenders.

Section 7.9. <u>Guarantors' Covenants</u>. Each Guarantor covenants with Lender that such Guarantor shall (in each case, on such Guarantor's part and not on the part of the other Guarantors):

(a)     obtain, comply with the terms of and do all that is necessary to maintain in full force and effect all authorizations, approvals, licenses and consents required in or by the laws and regulations of The Bahamas to enable it or him lawfully to enter into and perform its or his Obligations under this Agreement and the other Loan Documents to which each Guarantor is a party or to ensure the legality, validity, enforceability or admissibility in evidence in The Bahamas of this Agreement and the other Loan Documents to which each Guarantor is a party;

(b)     in the event that the costs of the construction for the Approved Infrastructure Improvements or other costs exceed the sums set forth in the approved Budget and the Approved Business Plan then in such event such Guarantor shall contribute to Borrower such

49

additional costs from time to time from their own resources as Borrower are unable to contribute from its resources in accordance with the provisions of the Completion Guaranty.

      (c)    promptly inform Lender upon the receipt of knowledge of the occurrence of any event which is or may become (with the passage of time, the giving of notice, the making of any determination hereunder or any combination thereof) an Event of Default;

      (d)    ensure that at all times the claims of Lender against Borrower under this Agreement and the other Loan Documents rank in priority to the claims of all of Borrower's other creditors save the holder of the Senior Loan and those whose claims are preferred by any bankruptcy, insolvency, liquidation or other similar laws of general application; and

      (e)    ensure that all loans from shareholders, affiliates, or third parties to Borrower are formally subordinated to the Loan.

## ARTICLE VIII
### EVENTS OF DEFAULT

    **Section 8.1.** <u>Events of Default.</u>  If any of the following events ("Events of Default") shall occur and be continuing:

    (a)    (i) failure to pay any principal of the Loan when the same shall become due and payable or (ii) failure to pay any interest on the Loan within five (5) Business Days after the same becomes due and payable, or (iii) failure to make any other payment under any Loan Document within five (5) Business Days after notice from Lender of such failure;

    (b)    any representation or warranty made by any Borrower Entity (or any of their respective officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made;

    (c)    any provision of the Organizational Documents of Borrower affecting the purpose for which Borrower is formed is amended or modified in any material manner without the prior written consent of Lender, or any Pledgor fails to perform or enforce the provisions of the Organizational Documents of Borrower in a manner that is reasonably likely to result in a Material Adverse Effect or attempts to dissolve;

    (d)    a Change of Control occurs with respect to Borrower ;

    (e)    Borrower shall fail to keep in full force and effect the policies of insurance required pursuant to Section 6.2(f);

    (f)    any Borrower Entity shall fail to perform any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for thirty (30) days after written notice thereof shall have been given to Borrower and the applicable Borrower Entity by Lender; <u>provided</u>, <u>however</u>, that the failure by Borrower or any other Borrower Entity to effect such remedy within such thirty (30) day period shall not constitute an Event of Default if (i) such failure to perform is susceptible of cure but cannot be cured with diligent efforts within such thirty (30) day period and (ii) Borrower and such Borrower Entity commences such cure prior to the expiration of such thirty (30) day period,

diligently and continuously prosecutes such cure and completes such cure not later than sixty (60) days after the expiration of such thirty (30) day period;

(g)    (1) A court enters a decree or order for relief under the Bankruptcy Code with respect to Borrower or any Borrower Entity in an involuntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed or other similar relief is not granted under any applicable federal or state law; or (2) the continuance of any of the following events for sixty (60) days unless dismissed, bonded or discharged:  (a) an involuntary case is commenced against Borrower or any Borrower Entity under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or (b) a decree or order of a court for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Borrower or any Borrower Entity or over all or a substantial part of its respective property, is entered; or (c) an interim receiver, trustee or other custodian is appointed without the consent of Borrower or any Borrower Entity for all or a substantial part of the property of such Person; or

(h)    (1) An order for relief is entered with respect to Borrower; Borrower commences a voluntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case under any such law or consents to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or (2) Borrower makes any assignment for the benefit of creditors; or (3) partners, shareholders, or members in any Borrower Entity adopts any resolution or otherwise authorizes action to approve any of the actions referred to in this Section 8.1(h);

(i)    any judgment or order for the payment of money in excess of $100,000.00 shall be rendered against Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that the foregoing judgment or order shall not constitute an Event of Default if (A) its payment is covered by a valid and existing insurance policy which is in full, force and effect and (B) the relevant insurance company is not disputing or challenging its obligation and duty to insure against and pay such judgment or order;

(j)    any non-monetary judgment or order shall be rendered against Borrower that is reasonably likely to have a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(k)    any provision of any Loan Document after delivery thereof shall for any reason (other than those attributable to the acts or omissions of Lender) cease to be valid and binding on or enforceable against any Borrower Entity, or any Borrower Entity shall so state in writing and such invalidity materially adversely affects Lender's rights and remedies under the Loan Documents; provided, however, that the foregoing shall not constitute an Event of Default if Borrower or any other Borrower Entity cures the foregoing within thirty (30) days after Borrower's receipt of notice of such occurrence or Borrower's written statement, as applicable;

(l)    any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in the Collateral purported to be covered thereby;

(m)    the occurrence of any of the following with respect to Borrower:  (i) the occurrence of a Senior Debt Event of Default, after expiration of any notice and cure period applicable thereto; (ii) acceleration of any Permitted Debt in the aggregate amount of $100,000.00 or more; (iii) the occurrence of a default under any Permitted Debt in the aggregate amount of $100,000.00 or more not cured within the grace or curative period applicable to such Permitted Debt or (iv) the occurrence of a default or breach under any Material Contracts not cured within any applicable grace period or the loss or termination of any Proprietary Rights which, in Lender's reasonable judgment, could have a Material Adverse Effect.

(n)    Breach of any financial covenant set forth in Section 7.4 which continues for ten (10) days following notice of such failure.

**Section 8.2.** Remedies. Upon the occurrence of any Event of Default specified in Sections 8.1(g) and 8.1(h), payment of all Obligations shall be accelerated without notice, presentment, demand, protest or notice of protest and shall be immediately due and payable and, in addition, Lender may in addition to any other rights and remedies available to Lender at law or in equity or under any other Loan Documents, exercise one of more of the following rights and remedies as it, in its sole discretion, deems necessary or advisable.  Upon the occurrence of any Event of Default (other than Events of Default specified in Sections 8.1(g) and 8.1(h), Lender, in addition to any other rights or remedies available to Lender at law or in equity, or under any of the other Loan Documents, may, subject to the terms of the Senior Loan Documents and the Intercreditor Agreement, exercise any one or more of the following rights and remedies as it, in its sole discretion, deems necessary or desirable:

(a)    Acceleration.  Declare immediately due and payable, without further notice, protest, presentment, notice of protest or demand, all Obligations including all monies advanced under this Agreement, the Note, or any of the Loan Documents which are then unpaid, together with all interest then accrued thereon and all other amounts then owing (including any interest at the default rate of interest or Exit Fee premium owed as a result of such acceleration).  If payment of the Obligations is accelerated, Lender may, in its sole discretion, exercise all rights and remedies hereunder and under the Note, the Equity Pledge Agreements and/or any of the other Loan Documents at law, in equity or otherwise.

(b)    No Further Obligations.  Terminate Lender's obligations under this Agreement.

(c)    Injunctive Relief.  Institute appropriate proceedings for injunctive relief (including specific performance of the obligations of Borrower).

(d)    Accounts.  Release all funds contained in the Accounts to be applied to the Obligations.

**Section 8.3.** Remedies Cumulative; Waivers; Reasonable Charges.  All of the remedies given to Lender in the Loan Documents or otherwise available at law or in equity to Lender shall be cumulative and may be exercised separately, successively or concurrently.  Failure to exercise any one of the remedies herein provided shall not constitute a waiver thereof by Lender, nor shall

the use of any such remedies prevent the subsequent or concurrent resort to any other remedy or remedies vested in Lender by the Loan Documents or at law or in equity.  To be effective, any waiver by Lender must be in writing and such waiver shall be limited in its effect to the condition or default specified therein, and no such waiver shall extend to any subsequent condition or default.  It is agreed that (i) the actual costs and damages that Lender would suffer by reason of an Event of Default (exclusive of the attorneys' fees and other costs incurred in connection with enforcement of Lender's rights under the Loan Documents) or a prepayment would be difficult and needlessly expensive to calculate and establish, and (ii) the amounts of the default rate of interest, the late charge, Exit Fee are reasonable, taking into consideration the circumstances known to the parties at this time, and (iii) the default rate, the late charges and Lender's reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement of Lender's rights under the Loan Documents shall be due and payable as provided herein, and (iv) the default rate, late charges, Exit Fee and the obligation to pay Lender's reasonable attorneys' fees and other enforcement costs do not, individually or collectively, constitute a penalty.

**ARTICLE IX**
**ASSIGNMENTS AND PARTICIPATIONS;**
**SECONDARY MARKET SERVICING**

**Section 9.1.**  Section 9.1.  Assignments of Lender's Interests in the Loan.

(a)     Lender may assign to one or more Permitted Transferees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Note).

(b)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in any such assignment, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment, have the rights and obligations of Lender hereunder and (ii) the assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, relinquish its rights and be released from its obligations under this Agreement which arise after the effective date of such assignment.  Lender shall deliver written notice to Borrower of any such assignment.

(c)     Upon Borrower's receipt of written notice of the assignment of all or a portion of Lender's rights and obligations hereunder to a Permitted Transferee, which notice shall specify the name and contact information for such Permitted Transferee and shall be accompanied by commercially reasonable evidence that the assignee qualifies as a Permitted Transferee, Borrower shall have the same obligations to such Permitted Transferee with respect to the portion of the Loan assigned to such Permitted Transferee as it would have if such Permitted Transferee were the "Lender" under this Agreement.  To the extent Lender assigns all or a portion of its rights and obligations under this Agreement to multiple assignees, such notice shall also specify a single contact who shall act on behalf of, and as agent for, such multiple assignees, and shall specify that such single point of contact has full authority to act as agent for the Lender and all assignees to grant approvals or make determinations under the Loan Documents, to issue default notices, and to enforce the provisions of this Agreement, subject to voting provisions agreed upon by the Lender and the assignees.  Notwithstanding the foregoing

53

to the contrary, Lender acknowledges and agrees that Lender or another Blackacre Entity shall remain the agent and sole point of contact with Borrower.

**Section 9.2.** <u>Monitoring</u>.

        (a)      So long as the Obligations of Borrower under the Loan Documents remain outstanding, Lender shall have the right to engage a third party asset manager (together with any successor asset manager appointed by Lender, the "Asset Manager") to review Borrower's contracts, agreements and documents executed and delivered in connection with the Property and review the operations of Borrower and the Property.

        (b)      So long as the Obligations of Borrower under the Loan Documents remain outstanding, Lender shall have the right to engage a third party construction consultant prior to and during the Construction of the Improvements (together with any successor appointed by Lender, the "Construction Consultant") to (i) review the Plans and Specifications, the Budget, the Construction Contract, the Contracts, the schedule of completion of the Approved Infrastructure Improvements, draw requests and any and all other documents in connection with the Construction of the Improvements, (ii) periodically inspect the Property to monitor the progress of the Construction of the Improvements, (iii) advise Lender whether the construction of the Project to date is in accordance with the Plans and Specifications and the schedule of completion of the Approved Infrastructure Improvements, (iv) approve Borrower's then current requests for advances under the Senior Debt, (v) approve any change orders, and (vi) confirm that the work on account of which a request for advance is sought under the Senior Debt has been completed in a good and workmanlike manner to the Construction Consultant's satisfaction within cost estimates approved by Lender.  The fees of the Construction Consultant shall be paid at Borrower's sole cost and expense.  Lender acknowledges that it is the intention of Lender and Senior Lender to utilize the same Construction Consultant.

        (c)      Borrower acknowledges that (i) the Construction Consultant may be retained by Lender, at the sole expense of Borrower, to act as a consultant and only as a consultant to Lender in connection with the construction of the Approved Infrastructure Improvements and has no duty to Borrower; (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender; (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be acceptable to Lender under this Agreement, without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto; and (iv) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other Person; and (v) Lender reserves the right to replace the Construction Consultant with another inspecting construction consultant at any time and without prior notice to or approval by Borrower if Senior Lender agrees to use such replacement in connection with the Senior Loan Documents.  The reasonable fees of the Construction Consultant shall be paid by Borrower within ten (10) days after billing therefor, but Lender  shall not have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to

properly perform its services, or (iii) any approval by the Construction Consultant of the construction of the Approved Infrastructure Improvements. Lender does not assume any obligation to Borrower or any other Person concerning the quality of construction of the Improvements or the absence therefrom of defects.

Section 9.3. <u>Transfers of Interests in the Loan</u>. Subject to the requirements of Section 9.4 of this Agreement, the Senior Loan Documents and the Intercreditor Agreement, Lender, at its option and own expense, may elect to transfer interests in the Loan. In such event and upon request by Lender to seek to effect one or more such transfers, Borrower shall promptly thereafter cooperate in all reasonable respects with Lender in the transfer including, but not limited to (i) amending this Agreement and the other Loan Documents, and executing such additional documents, in order to bifurcate the Loan into two or more constituent loans or to effect such other changes as may be necessary or desirable in connection with such a transfer provided that no such amendment or other change increases Borrower's or any other Borrower Entity's obligations, or decreases Borrower's or any other Borrower Entity's rights, hereunder (other than, in each case, to a de minimis extent); and (ii) providing such information as may be requested in connection with the preparation of offering materials in connection with such a transfer. Notwithstanding the foregoing to the contrary, Lender acknowledges and agrees that Lender or another Blackacre Entity shall remain the agent and sole point of contact with Borrower.

Section 9.4. <u>Registered Loan</u>.

(a)     Borrower shall maintain, or cause to be maintained, a register (the "Register") for the recordation of the names and addresses of Lender and any assignees of all or any portion of Lender's interest in the Loan (collectively, "Loan Assignees"), and the principal amount of the Loan (and stated interest thereon) (the "Registered Loan") held by Lender and each Loan Assignee from time to time. Lender shall provide Borrower with the names and addresses for any Loan Assignee. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrower, Lender and the Loan Assignees shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower, Lender and any Loan Assignee at any reasonable time and from time to time upon reasonable prior notice.

(b)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide), which registration Borrower shall effect immediately upon receipt of assignment documentation. Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), Borrower shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

**Section 9.5.** Participations.

      (a)    Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents; provided, that (i) Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged; (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the Loan amount, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loan, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or Borrower (except as may be provided in this Agreement or any other Loan Document). All participants shall be entitled to the benefits of Section 2.7 of this Agreement as if each such participant is a "Lender" hereunder.

      (b)    In the event that Lender sells participations in a Registered Loan, Lender shall maintain, acting solely for this purpose as a non-fiduciary agent of Borrower, a register on which it enters the name of all participants in the Registered Loans held by it and the principal amount thereof (and stated interest thereon) which is the subject of the participation (the "Participant Register"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by Borrower at any reasonable time and from time to time upon reasonable prior notice.

    **Section 9.6.** Pledge of Loan as Collateral Security. Lender may at any time and from time to time pledge or grant a security interest in all or any portion of its rights under this Agreement, the other Loan Documents and the Loan as collateral security to secure obligations of Lender, Affiliates of Lender or funds or accounts managed by Lender or by an Affiliate of Lender (and any such initial or subsequent pledgee or grantee, as the case may be, may in turn at any time and from time to time pledge or grant a security interest in all or any portion of such rights and Loan as collateral security to secure obligations of such Person, Affiliates of such Person or funds or accounts managed by such Person or by an Affiliate of such Person); provided that neither such initial nor any subsequent pledge or grant of a security interest shall in any event (i) release Lender from any of its obligations hereunder, and (ii) substitute any such pledgee or grantee for Lender as a party hereto with any rights or remedies hereunder or under any of the other Loan Documents..

## ARTICLE X
## MISCELLANEOUS

    **Section 10.1.** Amendments, Etc. No amendment or waiver of any provision of this Agreement, the Note or any other Loan Document, nor consent to any departure by Borrower or any of the Borrower Entity therefrom, shall in any event be effective unless the same shall be in

writing and signed (or, in the case of the Collateral Documents, consented to) by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.2. <u>Notices, Etc.</u> Unless otherwise specifically provided herein, any notice or other communication required or permitted to be given shall be in writing addressed to the respective party as set forth below and may be personally served, telecopied (with request for confirmation) or sent by overnight courier service or United States registered mail return receipt requested, postage prepaid. Any notice so given shall be deemed effective upon delivery or on refusal or failure of delivery during normal business hours. Notices shall be addressed to the parties at the addresses described below or to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this Section 10.2.

| | |
|---|---|
| if to any Borrower Entity: | c/o Chub International, L.C.<br>1510 South East 17th Street, Suite 400A<br>Fort Lauderdale, Florida 33316<br>Attention: Walt McCrory<br>T:   (954) 462-5835<br>F:   (954) 761-8925 |
| with copies to: | Clifford Chance US LLP<br>31 West 52nd Street<br>New York, NY 10019<br>Attention: Jay L. Bernstein, Esq.<br>T:   (212) 878-8527<br>F:   (212) 878-8375 |
| if to Lender: | Blackacre Capital Management, LLC<br>229 Park Avenue, Floors 21-23<br>New York, New York 10171<br>Attention: Mr. William A. Scully<br>T:   (212) 909-1413<br>F:   (212) 909-1400 |
| with a copy to: | Katten Muchin Rosenman LLP<br>525 West Monroe Street, Suite 1600<br>Chicago, Illinois 60661<br>Attention: Andrew D. Small, Esq.<br>T:   (312) 902-5489<br>F:   (312) 902-8662 |

If applicable, any notice sent to Lender shall simultaneously be sent to the Asset Manager at the address designated by any Person servicing the Loan on behalf of Lender.

Section 10.3. <u>No Waiver; Remedies.</u> No failure on the part of Lender to exercise, and no delay in exercising, any right hereunder or under the Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise

thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**Section 10.4.** Costs, Expenses.

(a)     Borrower agrees to pay on demand (and whether or not the transaction described herein closes) (i) all reasonable costs and expenses of Lender or Asset Manager in connection with the preparation, execution, delivery, administration, modification and amendment of the Loan Documents (including, without limitation, (A) all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable fees and expenses of counsel for Lender or Asset Manager with respect thereto, with respect to advising Lender or Asset Manager as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with Borrower or with other creditors of Borrower or any other Borrower Entity arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto); provided that with respect to servicing fees, Borrower shall only be responsible for such fees described in the last sentence of Section 9.2, and (ii) from and after a Default, all costs and expenses of Lender or Asset Manager in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for Lender and with respect thereto). If Borrower fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of Borrower by Lender, in its sole discretion, and any amount so paid shall be reimbursed by Borrower to Lender upon demand.

(b)     Borrower agrees to indemnify and hold harmless Lender, the Asset Manager and each of their respective Affiliates and their officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the Loan, the actual or proposed use of the proceeds of the Loan, the Loan Documents or any of the transactions contemplated thereby, except to the extent such claim, damage, loss, liability or expense resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.4(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Borrower or any other Borrower Entity, its directors, shareholders or creditors or an Indemnified Party or any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Lender and Borrower also agree not to assert any claim against the other or their respective Affiliates, or any of their respective officers, directors, employees, attorneys and agents, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Loan, the actual or proposed use of the proceeds of the Loan, the Loan Documents or any of the

58

transactions contemplated thereby.  THE FOREGOING INDEMNITY AND AGREEMENT NOT TO ASSERT CLAIMS EXPRESSLY APPLIES, WITHOUT LIMITATION, TO THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF THE APPLICABLE PARTIES.

(c)     Borrower shall give prompt written notice to Lender of any proceeding, inquiry or written notice by or from any governmental or non governmental entity related to any matter covered by the indemnity in Section 10.4(b) with respect to any of the Property, and each Indemnified Party shall give  Borrower prompt notice of any Indemnified Claim (as defined below) of which such Indemnified Party has knowledge; provided, however, that failure to provide such notice shall in no manner limit or otherwise affect Borrower's obligations under this Section 10.4 except to the extent Borrower is actually prejudiced with respect to such Indemnified Claim as a result of such failure.  Promptly upon receipt of the same, Borrower shall deliver to Lender copies of any and all documentation related to any claim that is, in whole or in part, subject to indemnification pursuant to such indemnity (an "Indemnified Claim"), and any and all orders, notices, permits, applications, reports, and other written communications, documents, and instruments pertaining thereto.

(d)     Except to the extent that doing so would result in a waiver of the attorney client privilege, Borrower  shall cause the attorneys that it selects to defend any Indemnified Claim (i) directly to keep Lender fully apprised of all matters relating to such Indemnified Claim including, without limitation, to copy Lender on all written materials generated or received by such attorneys, and (ii) to agree that Lender shall be entitled to rely upon the work product of such attorneys to the same extent that Borrower and any other Borrower Entity is entitled to rely thereon.

(e)     If at any time (i) Borrower shall fail diligently to investigate, prosecute, negotiate or defend, as applicable, any Indemnified Claim, (ii) Borrower shall fail to keep Lender fully apprised of the status of any Indemnified Claim or (iii) Lender concludes, in the exercise of its reasonable judgment, that Borrower's or any other Borrower Entity's handling of the Indemnified Claim is reasonably likely to result in greater liability than would result if Lender were directly defending or prosecuting such Indemnified Claim, Lender may, but shall not be obligated to, subject to Section 10.4(f), and upon five (5) Business Days' prior written notice to Borrower, employ its own legal counsel and consultants to investigate, prosecute, negotiate or defend any such Indemnified Claim.  Upon the occurrence of either of the events described in clause (i) or (ii) above, Lender shall also have the right to compromise or settle such Indemnified Claim on its behalf without the necessity of showing actual liability therefor, and without the consent of Borrower or any other Borrower Entity.  Borrower shall reimburse Lender, upon demand, for all costs incurred by Lender, including, without limitation, the amount of all costs of settlements entered into by Lender (subject to the preceding sentence, any such settlement shall be subject to the prior approval of Borrower, which approval shall not be unreasonably withheld or delayed).

(f)     If any Indemnified Party is named as a party in a proceeding brought by a third party, the subject matter of which proceeding is an Indemnified Claim, and such Indemnified Party determines in its reasonable judgment that it is inappropriate for Borrower's counsel to jointly defend Borrower or any other Borrower Entity and such Indemnified Party, then, in addition to the rights of Lender set forth in Section 10.4(e), Lender or the applicable Indemnified Party, as the case may be, shall have the right, but not the obligation, to employ its own counsel

59

to negotiate, defend and settle such Indemnified Claim on its behalf (such settlement to be approved by Borrower, which approval shall not be unreasonably withheld or delayed), and Borrower shall reimburse Lender or the applicable Indemnified Party upon demand for all costs thereby incurred by Lender or the applicable Indemnified Party. However, in any such case, at Borrower' request, Lender or the applicable Indemnified Party shall consult with Borrower to provide Borrower with an opportunity to demonstrate to Lender or the applicable Indemnified Party's reasonable satisfaction that counsel, employed by Borrower, where the action in which the Lender or any Indemnified Party is named as a defendant is also an action to which either Borrower or any other Borrower Entity is a party, will adequately protect the interest of Lender or such Indemnified Party, as the case may be, without the need for separate counsel.

(g)     Borrower shall not, without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed, (i) settle or compromise any action, suit, proceeding, or claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to Lender of (x) a full and complete written release of Lender or the applicable Indemnified Party (in form, scope and substance reasonably satisfactory to Lender or the applicable Indemnified Party) from all liability in respect of such action, suit or proceeding and (y) a dismissal with prejudice of such suit, action or proceeding against the applicable Indemnified Party; or (ii) settle or compromise any action, suit, proceeding, or claim in any manner that has a reasonable likelihood of having a Material Adverse Effect.

(h)     Except as otherwise provided in subsections (e), (f) and (g) above, Borrower shall have exclusive control over the defense of any Indemnified Claim.

(i)     Without prejudice to the survival of any other agreement of Borrower hereunder or under any other Loan Document, the agreements and obligations of Borrower contained in Sections 2.7 and 2.9 and this Section 10.4 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

**Section 10.5.** Binding Effect. This Agreement shall become effective when it shall have been executed by Borrower, each other Borrower Entity and Lender and thereafter shall be binding upon and inure to the benefit of Borrower, each other Borrower Entity and Lender and their respective successors and assigns, except that no Borrower Entity shall have the right to assign its rights hereunder or any interest herein without the prior written consent of Lender.

**Section 10.6.** Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.7.** Jurisdiction, Etc.

(a)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the

other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

**Section 10.8.** Governing Law. This Agreement, the Note and each other Loan Document shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely within such state.

**Section 10.9.** Waiver of Jury Trial. To the maximum extent permitted by law, Borrower, each other Borrower Entity and Lender irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, or the actions of Lender in the negotiation, administration, performance or enforcement thereof.

**Section 10.10.** Further Assurances. Each Borrower Entity agrees to execute such additional instruments as may be reasonably requested by Lender in order to carry out the intent of this Agreement and the other Loan Documents and to perfect or give further assurances of any of the rights or security interests granted or provided for hereunder, under the Note or under any other Loan Document.

**Section 10.11.** Certain Lender Matters. Lender may, in accordance with Lender' customary practices, destroy or otherwise dispose of all documents, schedules, invoices or other papers, delivered by Borrower to Lender unless Borrower requests, at the time of delivery in writing that same be returned. Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender, to grant Lender any interest in the Property or to create any interest in the Collateral other than that of pledgee, beneficiary or lender. No provision in this Agreement or in any of the other Loan Documents and no course of dealing between the parties shall be deemed to create any fiduciary duty by Lender to Borrower or any other Person. All attorneys, accountants, appraisers, and other professional Persons and consultants retained by Lender shall have the right to act exclusively in the interest of Lender and shall have no duty of loyalty, duty of care or any other duty to Borrower or any of its respective partners, shareholders, members, managers, Affiliates or any other Person. By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender

61

pursuant to the Loan Documents, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect hereto or thereto by Lender. Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, Subsidiary or Affiliate of Lender or their respective attorneys, advisors, accountants, officers, representatives, directors, employees, partners, shareholders, trustees, members or managers. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, Subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates. LENDER SHALL HAVE NO LIABILITY HEREUNDER FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT DAMAGES. In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower or its creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the entire secured Obligations at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower after such date. Lender shall have the right from time to time to designate, appoint and replace one or more servicers and to allow servicer to exercise any and all rights of Lender under the Loan Documents. All documents and other matters required by any of the provisions of this Agreement to be submitted or provided to Lender shall be in form and substance satisfactory to Lender. Borrower shall not be entitled to (and does hereby waive any and all rights to receive) any notices of any nature whatsoever from Lender except with respect to matters for which the Loan Documents expressly provide for the giving of notice by Lender to Borrower. No such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon any Loan Document.

## ARTICLE XI
### Guarantees

**Section 11.1.**  Guarantors hereby jointly and severally irrevocably and unconditionally:

(i)      guarantee to Lender the due and punctual observance and performance of all the terms, conditions and covenants on the part of Borrower contained in this Agreement and, following an Event of Default, agrees to pay to Lender from time to time on demand any and every sum or sums of money due and which Borrower shall at any time be liable to pay to Lender under or pursuant to this Agreement and which shall not have been paid at the time such demand is made;

(ii)      agree as a primary obligation to indemnify Lender from time to time on demand by Lender from and against any loss incurred by Lender as a result of any of the Obligations of Borrower under or pursuant to this Agreement being or becoming void, voidable, unenforceable

or ineffective as against Borrower for any reason whatsoever, whether or not known to Lender, the amount of such loss being the amount which the person or persons suffering it would otherwise have been entitled to recover from Borrower; and

(iii)    guarantee to the Lender:

(a)    Substantial Completion of Development pursuant to the Building Contracts and otherwise with respect to the Development shall occur on or before _____ 2007 ("Final Completion Date") in accordance end in compliance with all laws and regulations, the Plans and Specifications and the time periods and other requirements set forth therein, free and clear of all claims and liens (the "Construction") and that Borrower will fully, completely and punctually observe, perform and satisfy of all of its obligations, duties, covenants and agreements under the Facility Agreement, the other Security Documents and the Building Contracts with respect to such Substantial Completion including, without limitation, the following (collectively, "Construction Obligations"):

(1) Borrower shall perform with due diligence and continuity in an expeditious and first-class workmanlike manner, and complete and pay for (or cause such performance, completion and payment) the construction and to pay (or cause to be paid) all Development Costs (including, but not limited to, any shortfalls or cost overruns) and any costs or obligations incurred (including, but not limited to, attorney fees) or associated with the construction of the Development (including, without limitation, the costs of the Professional Team, the construction manager and any engineers' or consultants' fees), whether or not final completion occurs on, before or after the Final Completion Date;

(2) Borrower shall correct or cause to be corrected as soon as possible any material defect in the construction (including, without limitation, any material defect in workmanship or quality of the construction or materials) or any material departure or variation from the Plans and Specifications;

(3)    Borrower shall provide the expertise necessary to supervise the construction at no cost to the Lender;

(4)    if any claims or Encumbrance should be filed, or should attach, with respect to the Development by reason of the construction, Borrower shall immediately cause the removal and discharge of all such claims and Encumbrance;

(5)    if any claims or Encumbrance should be filed, or should attach, with respect to the personal property fixtures, attachments and equipment delivered to the Development and owned by Borrower (or as to which Borrower have any right, title or interest), Borrower shall immediately cause the removal and discharge of all such claims or Encumbrances;

(6)    Borrower shall punctually pay and discharge impositions and premiums for all policies of insurance required to be furnished by it pursuant to this Agreement and the Building Contracts during the construction; and

(7)    Borrower shall keep the Development Costs in balance;

(b)    that in the event Guarantors shall fail or refuse to pay or perform the construction work with respect to the Development (the "Construction") or fail or refuse fully, completely and punctually to observe, perform and satisfy all of Borrower's construction obligations, duties, covenants and agreements under the Senior Loan Documents with respect to such final completion (or in each case to fail or refuse to cause Borrower to so pay and perform), the Lender may pay or perform or cause the payment and performance of the Construction and of all of Borrower's construction obligations, duties, covenants and agreements under the Senior Loan Documents with respect to such Substantial Completion of the Development said try connection therewith, take possession of the Development and cause final completion of the Construction, in which case Guarantors, upon demand b the Lender, shall (x) pay any and all costs, expenses, liabilities and claims with respect thereto, (y) cause any claim or Encumbrance in connection therewith to be bonded, discharged, released or paid and (z) reimburse the Lender for all sums paid and all costs, expenses or liabilities incurred by it in connection therewith; and

(c)    to pay on demand, any and all expenses, including, without limitation, attorney fees incurred by the Lender in the enforcement, obtaining advice of counsel with respect to, or collection of, any or all of the guaranteed obligations hereunder (collectively, the "Guaranteed Obligations").

Section 11.2.  The Guaranteed Obligations shall be in addition to and independent of every other security, which Lender may at any time, hold in respect of any of Borrower's Obligations hereunder.

Section 11.3.  The Guaranteed Obligations shall constitute and be continuing obligations notwithstanding any settlement of account or other matter or thing whatsoever, and in particular but without limitation, shall not be considered satisfied by any intermediate payment or satisfaction of all or any of the Obligations of Borrower under this Agreement and shall continue in full force and effect until final payment in full of all amounts owing by Borrower hereunder and total satisfaction of all Borrower's actual and contingent Obligations hereunder.

Section 11.4.  Neither the Guaranteed Obligations nor the rights, powers and remedies conferred in respect of Guarantors upon Lender by this Agreement or by law shall be discharged, impaired or otherwise affected by:    (a) the winding-up, dissolution, administration or reorganization of Borrower or any change in its status, function, control or ownership; (b) any of the Obligations of Borrower hereunder or under any other security taken in respect of any of its Obligations hereunder being or becoming illegal, invalid, unenforceable or ineffective in any respect; (c) time or other indulgence being granted or agreed to be granted to Borrower in respect of its Obligations hereunder or under any such other security (unless the same was agreed to in writing by Lender); (d) any amendment to, or any variation, waiver or release of, any obligation of either of Borrower hereunder or under any such other security (unless the same was agreed to in writing by Lender); (e) any failure to take, or fully to take, any security contemplated hereby or otherwise agreed to be taken in respect of Borrower's Obligations hereunder; (f) any failure to realize or fully to realize the value of, or any release, discharge, exchange or substitution of, any security taken in respect of Borrower's Obligations hereunder; or (g) any other act, event or omission which, but for this Section might operate to discharge, impair or otherwise affect any of the Obligations of Guarantors herein contained or any of the rights, powers or remedies conferred upon Lender by this Agreement or by law.

64

**Section 11.5.** Any settlement or discharge between Guarantors and Lender shall be conditional upon no security or payment to Lender by Borrower or Guarantors or any other person on behalf of Borrower or, as the case may be, Guarantors being avoided or reduced by virtue of any provisions or enactments relating to bankruptcy, insolvency, liquidation or similar laws of general application for the time being in force and, if any such security or payment is so avoided or reduced, Lender shall be entitled to recover the value or amount of such security or payment from Guarantors or any of them subsequently as if such settlement or discharge had not occurred.

**Section 11.6.** Lender shall not be obliged before exercising any of the rights, powers or remedies conferred upon it in respect of Guarantors by this Agreement or by law: (a) to make any demand of Borrower; (b) to take any action or obtain judgment in any court against Borrower; (c) to make or file any claim or proof in a winding-up or dissolution of Borrower; or (d) to enforce or seek to enforce any other security taken in respect of any of the Obligations of Borrower hereunder.

**Section 11.7.** Guarantors jointly and severally agree that, so long as of the Obligations remain outstanding, any rights which Guarantors or any of them may at any time have by reason of performance by them of the Guaranteed Obligations hereunder: (a) to be indemnified by Borrower; and/or (b) to claim any contribution from any other guarantor of Borrower's Obligations hereunder; and/or (c) to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of Lender hereunder or of any other security taken pursuant to, or in connection with, this Agreement by Lender, shall be exercised by Guarantors in such manner and upon such terms as Lender may require and Guarantors further jointly and severally agree to hold in trust any monies at any time received by them as a result of the exercise of any such rights for and on behalf of, and to the order of, Lender for application in or towards payment of any sums at any time owed by Borrower hereunder.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

CHUB CAY CLUB ASSOCIATES LIMITED

By: _____
Name: _____
Title:  Director

CHUB CAY RESORTS LIMITED

By: _____
Name: _____
Title:  Director

BA CHUB CAY, LLC, a Delaware limited liability company

By:    Styx Partners, L.P., a Delaware limited partnership, its managing member

        By:    Styx Associates LLC, a Delaware limited liability company, its general partner

                By:_____
                Name:_____
                Title:_____

As of the date set forth above, each of the undersigned Borrower Entities hereby acknowledge and agree to be bound by the terms, conditions and provisions set forth herein applicable to such Borrower Entity.

_____
WALTER J. MCCRORY

_____
BOB L. MOSS

_____
KAYE PEARSON

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

CHUB CAY CLUB ASSOCIATES LIMITED

By:_____
Name:_____
Title:  Director

CHUB CAY RESORTS LIMITED

By:_____
Name:_____
Title:  Director

BA CHUB CAY, LLC, a Delaware limited liability company

By:    Styx Partners, L.P., a Delaware limited partnership, its managing member

      By:    Styx Associates LLC, a Delaware limited liability company, its general partner

           By:_____
           Name:_Mark A Neporent__
           Title:_Senior Managing Director_

As of the date set forth above, each of the undersigned Borrower Entities hereby acknowledge and agree to be bound by the terms, conditions and provisions set forth herein applicable to such Borrower Entity.

_____
WALTER J. MCCRORY

_____
BOB L. MOSS

_____
KAYE PEARSON

Exhibit B

## PROMISSORY NOTE

US $16,000,000.00

May 10, 2007

FOR VALUE RECEIVED, the undersigned, CHUB CAY CLUB ASSOCIATES LIMITED and CHUB CAY RESORTS LIMITED, each Bahamian companies (the "Borrowers") hereby jointly and severally promise to pay to the order of BA CHUB CAY, LLC, a Delaware limited liability company (the "Lender"), on the each Payment Date under (and as defined in) the Loan Agreement (as hereinafter defined) the principal sum of Sixteen Million and No/100ths Dollars (US $16,000,000.00) or if less, the aggregate unpaid principal amount of the Loan advanced from time to time by Lender to Borrowers pursuant to that certain Loan and Security Agreement of even date herewith (together with all further amendments and other modifications, if any, from time to time thereafter made thereto, the "Loan Agreement") made by and among Borrowers of the first part Walter J. McCrory, Bob L. Moss and Kay Pearson as Guarantors of the second part and the Lender of the third part.

Borrowers also jointly and severally promise to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise), at the rates per annum and on the dates specified in the Loan Agreement.

Interest on the unpaid principal balance of the loan shall be computed on the basis of the actual number of days elapsed over a 360-day year. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever and are payable without relief from valuation and appraisement laws and with all reasonable costs and charges incurred in the collection or enforcement hereof, including, reasonable attorneys' fees and court costs.

Payments of both principal and interest are to be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Lender pursuant to the Loan Agreement.

This Note is a Note referred to in, and evidences indebtedness incurred under, the Loan Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which Borrowers are permitted and required to made prepayments and repayments of principal of the indebtedness evidenced by this Note and on which such indebtedness may be declared to be immediately due and payable.

Unless otherwise defined, terms used herein have the meanings provided in this Loan Agreement.

All parties, hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor. No release of any security for the obligations evidenced hereby or any person liable for payment of such obligations, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the Loan Documents made by agreement between Payee and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other person or party who may become liable under the Loan Documents, for the payment of all or any part of the Debt.

In the event of any conflict between the provisions of this Note and any provision of the Loan Agreement, then the provisions of the Loan Agreement shall control.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
EXECUTION PAGE FOLLOWS.]

Dated: ~~April~~ May 10 , 2007.

CHUB CAY CLUB ASSOCIATES LIMITED

By: _____

Title: Director

CHUB CAY RESORTS LIMITED

By: _____

Title: Director

Aldine ™ Enviro-Tab ™     Mixed Sources Cert no SW-COC-1912  © 1996 FSC

Exhibit C

BA CHUB CAY, LLC
c/o Styx Partners, L.P.
299 Park Avenue
New York, NY 10171

February 20, 2008

CHUB CAY CLUB ASSOCIATES LTD.
CHUB CAY RESORTS LTD.
WALTER J. MCCRORY
BOB L. MOSS
KAYE PEARSON
c/o Chub International, L.C.
1510 South East 17th Street, Suite 400A
Fort Lauderdale, Florida 33316
Attention: Walt McCrory
Facsimile: (954) 761-8925

Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019
Attention: Jay L. Bernstein, Esq.
Facsimile: (212) 878-8375

Re:    Loan and Security Agreement dated as of May 10, 2007 (the "Loan Agreement") by and
among CHUB CAY CLUB ASSOCIATES LTD. and CHUB CAY RESORTS LTD.,
companies incorporated under the laws of the Commonwealth of The Bahamas
("Borrower"), WALTER J. MCCRORY, BOB L. MOSS, and KAYE PEARSON
(collectively, the "Guarantors," and each, individually, a "Guarantor"), and BA CHUB
CAY, LLC, a Delaware limited liability company ("Lender")

Ladies and Gentlemen:

Section 7.1(f) of the Loan Agreement provides: "Borrower shall (i) perform, in all material
respects, its obligations under, and enforce all monetary and any other material terms of, any
Material Contracts using commercially reasonable judgment on an arm's length basis and (ii)
deliver to Lender copies of any notices received or sent by any party under any Material
Contract." Under the Loan Agreement, the Senior Loan Documents constitute Material
Contracts.

Section 7.1(n) of the Loan Agreement provides:

"Borrower shall use commercially reasonable efforts to: [...] (4) ensure that Lender and the
Construction Consultant are provided with sufficient information to enable them to monitor the
monthly reports delivered by Borrower to the holder of the Senior Debt; (5) notify Lender and

the Construction Consultant as soon as practicable after it shall become apparent to Borrower that completion of the Approved Infrastructure Improvements will not be achieved by the date therefor contemplated in the Building Contract and notify the Lender of the reason for such delay; (6) submit to Lender and the Construction Consultant forthwith all master plans and specifications required to carry out the Approved Infrastructure Improvements and such other plans and specifications which the Construction Consultant may reasonably require for approval; (7) provide all financial and other information and assistance which Lender or the Construction Consultant may reasonably require to permit them to review and report on the progress of the Approved Infrastructure Improvements, including providing them with full and free access at all reasonable times to: (a) the Property and all buildings erected or being erected thereon; and (b) all plans, specifications and estimates of materials and services required, time and completion schedules and estimates of costs, and all approvals and certificates of and correspondence with any governmental or local authority in connection with the Approved Infrastructure Improvements or otherwise and supplying copies thereof as required by Lender or the Construction Consultant; (8) comply in all material respects with each Building Contract and notify Lender and the Construction Consultant in writing forthwith of any material breach or event which with the giving of notice or lapse of time or both would constitute a material breach thereof; [...].

Additionally, Section 7.3(a) provides: "[a]s soon as possible and in any event within five (5) days after obtaining knowledge of the occurrence of any Default under the Loan Documents, the Senior Loan Documents, any Material Contract or any event, development or occurrence reasonably likely to have a Material Adverse Effect, a statement from Borrower setting forth details of such Default, event, development or occurrence and the actions that Borrower or any other Borrower Entity has taken and proposes to take with respect thereto."

Section 7.3(b) provides: "[n]o later than forty-five (45) days following the last day of any calendar quarter, Borrower shall deliver to Lender an update to its underwriting model which reflects then current information and assumptions."

Section 7.3(c) provides: "[a]s soon as available and in any event within forty five (45) days after the end of each quarter, (i) a balance sheet of Borrower on a consolidated basis as of the end of such quarter; (ii) a statement of income and a statement of cash flows of Borrower for the period commencing at the end of the previous quarter and ending with the end of such quarter; and (iii) a statement of income and a statement of cash flows of Borrower for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding quarter of the preceding Fiscal Year, all in reasonable detail, and duly certified by Borrower. In addition, Borrower shall update Lender as to the status or any pending acquisitions."

As of the date hereof, despite continuing requests from Lender, Borrower has failed to provide Lender with the documentation required under Sections 7.1 and 7.3 in accordance with the terms and provisions of the Loan Agreement.

Accordingly, Lender is entitled to pursue various rights and remedies under the Loan Agreement and the other Loan Documents, including, without limitation, the right to impose late charges,

default interest, acceleration of the Obligations and the exercise of remedies under the Loan Documents and other collateral documents, including foreclosure of Lenders' security interests and liens in any collateral and pursuing claims against the Guarantors. Lender's election to not take any such action at the present time shall not constitute a waiver of such Event of Default or of the right of Lender to pursue any such rights and remedies at any time in the future.

Additionally, this letter shall constitute notice that Borrower is liable for all attorneys' fees, costs and expenses incurred by Lender in connection with the enforcement of Lender's rights and remedies under the Loan Documents and/or under applicable law.

Nothing contained in this letter nor in any other communications between Lender and Borrower shall be deemed to constitute or shall be construed as (i) a waiver or release of any of Lender's rights or remedies against Borrower or any other party to the Loan Documents or pursuant to applicable law, (ii) a course of dealing obligating Lender to provide any accommodations, financial or otherwise, to Borrower at any time, (iii) a waiver of any other default or event of default by Borrower under the Loan Documents or any other contract between the parties, or (iv) a commitment, or an agreement to make a commitment, with respect to any possible restructuring of the credit facilities provided in the Loan Agreement.

Nothing contained in this letter shall confer on Borrower or any other person or entity any right to other or further notice or cure periods with respect to the Events of Default. Lender hereby expressly reserves and preserves all of the rights and remedies of Lender under the Loan Agreement, the other Loan Documents and applicable law.

Should you have any questions, please call Todd Kristol at (212) 891-1547.

> BA CHUB CAY, LLC, a Delaware limited liability company
>
> By:    Styx Partners, L.P., a Delaware limited partnership, its managing member
>
>> By:    Styx Associates LLC, a Delaware limited liability company, its general partner
>>
>> By: _____
>> Name: Ronald J. Kravit
>> Title: _____

Aldine ™ Enviro-Tab ™

Mixed
Sources Cert no. SW-COC-1942  © 1996 FSC

**Exhibit D**

BA CHUB CAY, LLC
c/o Styx Partners, L.P.
299 Park Avenue
New York, NY 10171

February 20, 2008

Walter J. McCrory
Bob L. Moss
Kaye Pearson
c/o Chub International, L.C.
1510 South East 17th Street, Suite 400A
Fort Lauderdale, Florida 33316
Attention: Walt McCrory
Facsimile: (954) 761-8925

Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019
Attention: Jay L. Bernstein, Esq.
Facsimile: (212) 878-8375

Re:    Loan and Security Agreement dated as of May 10, 2007 (the "Loan Agreement") by and
among CHUB CAY CLUB ASSOCIATES LTD. and CHUB CAY RESORTS LTD.,
companies incorporated under the laws of the Commonwealth of The Bahamas
("Borrower"), WALTER J. MCCRORY, BOB L. MOSS, and KAYE PEARSON
(collectively, the "Guarantors," and each, individually, a "Guarantor"), and BA CHUB
CAY, LLC, a Delaware limited liability company ("Lender")

Ladies and Gentlemen:

We write in connection with the Loan Agreement. *All capitalized words used but not otherwise
defined herein shall have the meanings ascribed thereto in the Loan Agreement.*

Section 7.3(g) of the Loan Agreement provides that "upon request of Lender, each Guarantor
shall furnish financial information reasonably requested by Lender to evaluate compliance with
the financial covenants set forth in Section 7.4 below."

The financial covenants of Section 7.4 of the Loan Agreement are as follows:

(a)    Net Worth. Guarantors shall maintain a minimum combined net worth
(exclusive of investment in the Property) of no less than $75,000,000.00; and

(b)    Liquidity. Guarantors shall maintain minimum aggregate liquidity of no
less than $30,000,000.00.

Accordingly, Lender hereby requests that each Guarantor deliver to Lender currently certified financial statements so that Lender may evaluate Guarantors' compliance with Section 7.4 of the Loan Agreement.

Failure to deliver such financial information within ten days from the date hereof shall be deemed an Event of Default under Section 8.1(n) of the Loan Agreement.

Nothing contained in this letter nor in any other communications between Lender on the one hand and Borrower or Guarantors on the other hand, shall be deemed to constitute or shall be construed as (i) a waiver or release of any of Lender's rights or remedies against Borrower, any Guarantor or any other party to the Loan Documents or pursuant to applicable law, (ii) a course of dealing obligating Lender to provide any accommodations, financial or otherwise, to Borrower at any time, or (iii) a waiver of any default or event of default by Borrower or any Guarantor under the Loan Documents or any other contract between the parties. Lender hereby expressly reserves and preserves all of the rights and remedies of Lender under the Loan Agreement, the other Loan Documents and applicable law.

Should you have any questions, please call Todd Kristol at (212) 891-1547.

<div style="margin-left:40%">

BA CHUB CAY, LLC, a Delaware limited liability company

By:    Styx Partners, L.P., a Delaware limited partnership, its managing member

     By:    Styx Associates LLC, a Delaware limited liability company, its general partner

     By: _____

     Name: _Ronald J. Kravit_

     Title: _____

</div>

Aidine ™ Enviro-Tab ™

Mixed
Sources Cert no SW-COC-1567  © 1996 FSC
FSC

**Exhibit E**

BA CHUB CAY, LLC
c/o Styx Associates LLC
299 Park Avenue
New York, New York 10171

June 2, 2008

Chub Cay Club Associates Ltd.                          Walter J. McCrory
Chub Cay Resorts Ltd.                                  710 Coral Way
c/o Chub International, L.C.                            Fort Lauderdale, Florida 33301
1510 South East 17th Street, Suite 400A
Fort Lauderdale, Florida 33316
Attention: Walter J. McCrory
Facsimile: (954) 761-8925

Bob L. Moss                                            Kaye Pearson
625 Third Key Drive                                    1637 East Lake Drive
Fort Lauderdale, Florida 33304                         Fort Lauderdale, Florida 33316

Re:    Loan and Security Agreement dated as of May 10, 2007 (the "Loan Agreement") by and
       among Chub Cay Club Associates Ltd. and Chub Cay Resorts Ltd., companies
       incorporated under the laws of the Commonwealth of The Bahamas ("Borrower"),
       Walter J. McCrory, Bob L. Moss and Kaye Pearson (collectively, the "Guarantors," and
       each, individually, a "Guarantor"), and BA Chub Cay, LLC, a Delaware limited liability
       company ("Lender")

Ladies and Gentlemen:

       This letter serves as written notice to you that numerous Events of Default have occurred
under the Loan Agreement, which such Events of Default have not been remedied within any
applicable notice and cure period, and accordingly, Lender hereby notifies Borrower and
Guarantors that Lender has elected to accelerate the indebtedness under the Loan Agreement.

1.      Section 7.1(f) of the Loan Agreement provides: "Borrower shall (i) perform, in all
material respects, its obligations under, and enforce all monetary and any other material terms of,
any Material Contracts using commercially reasonable judgment on an arm's length basis, and
(ii) deliver to Lender copies of any notices received or sent by any party under any Material
Contract." Under the Loan Agreement, the Senior Loan Documents constitute Material
Contracts.

       We have been advised that Borrower has failed to (i) pay debt service to Senior Lender in
accordance with the terms and provisions of the Senior Loan Documents (ii) maintain the
required insurance coverages as set forth in the Senior Loan Documents and the Loan
Documents and (iii) pay real estate taxes and assessments levied against the Property, each of
which is in clear violation of Section 7.1(f) of the Loan Agreement.

2.    Section 7.1(n) of the Loan Agreement provides:

"Borrower shall use commercially reasonable efforts to: [...] (7) provide all financial and other information and assistance which Lender or the Construction Consultant may reasonably require to permit them to review and report on the progress of the Approved Infrastructure Improvements, including providing them with full and free access at all reasonable times to: (a) the Property and all buildings erected or being erected thereon; and (b) all plans, specifications and estimates of materials and services required, time and completion schedules and estimates of costs, and all approvals and certificates of and correspondence with any governmental or local authority in connection with the Approved Infrastructure Improvements or otherwise and supplying copies thereof as required by Lender or the Construction Consultant; (8) comply in all material respects with each Building Contract and notify Lender and the Construction Consultant in writing forthwith of any material breach or event which with the giving of notice or lapse of time or both would constitute a material breach thereof; [...]."

Despite repeated requests from Lender, Borrower and Guarantors have continually failed to apprise Lender of material breaches under the Building Contracts, including, without limitation, the institution or threatened institution of proceedings against Borrower and/or Guarantors by trade creditors of Borrower with respect to defaults by Borrower under the Building Contracts, in clear derogation of the terms and provisions of the Loan Agreement.

Further, while Borrower, Guarantors and Lender have had numerous discussions in respect of the Property and the financial condition of Borrower and Guarantors on many occasions subsequent to the closing date, it was not until after Caterpillar Financial Services Corporation, a Delaware corporation ("Caterpillar") filed an action against Guarantors in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, designated as Case No. 08-016700, that Guarantors disclosed the existence of defaults by Borrowers and Guarantors under their financing arrangements with Caterpillar in contravention of Section 7.1(n)(8) of the Loan Agreement.

3.    Section 7.3(a) provides: "[a]s soon as possible and in any event within five (5) days after obtaining knowledge of the occurrence of any Default under the Loan Documents, the Senior Loan Documents, any Material Contract or any event, development or occurrence reasonably likely to have a Material Adverse Effect, a statement from Borrower setting forth details of such Default, event, development or occurrence and the actions that Borrower or any other Borrower Entity has taken and proposes to take with respect thereto."

Throughout the term of the Loan, many material facts have come to light which constitute Defaults under the Loan Documents, including, without limitation, the willful failure to disclose the existence of defaults and proceedings affecting Borrower, Guarantors and the Property as stated above and the failure to pay debt service as and when due under the Senior Loan, of which Borrower failed to notify Lender, and further, Borrower has continually failed to provide any statement setting forth the details of such Defaults or the actions which Borrower

Lender hereby notifies you that Borrower has failed to cure the Events of Default described herein and continues to be in default under the Loan Documents. Based on such Events of Default, Lender, pursuant to its right under the Loan Agreement and the other Loan Documents, has accelerated the maturity of the Note and hereby declares the entire indebtedness evidenced by the Loan Documents immediately due and payable. This letter is formal notice to you of such acceleration and demand that you pay immediately all of the outstanding principal and accrued and unpaid interest under the Note, in its entirety, together with all applicable charges, totaling $18,764,150.39, and all costs, expenses and attorneys fees incurred by Lender in connection with the collection of the indebtedness evidenced by the Note, and any other amounts lawfully due and payable under the terms of the Loan Documents (the "Demanded Amount").

In the event that Lender fails to receive the Demanded Amount by June 4, 2008, Lender may exercise, in such order as Lender elects, any one or more of the remedies available to Lender pursuant to the Loan Documents or otherwise at law or in equity (including, without limitation, actions for the immediate appointment of a receiver and separate actions against one or more of the Guarantors), and nothing contained in this letter shall constitute a waiver of any rights of Lender to pursue such rights and remedies. Any negotiations between Borrower and Guarantors on the one hand and Lender on the other hand shall not constitute a waiver of Lender's right to exercise its rights and remedies under the Loan Documents or otherwise at law or in equity, including, but not limited to, those described in this letter. Any such waiver shall not be effective unless set forth in writing, duly executed by an authorized representative of Lender. Neither Borrower nor any of the Guarantors shall be entitled to rely upon any verbal statements made or purported to be made by or on behalf of Lender in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of its rights under the Loan Documents or otherwise at law or in equity. Please be further advised that no past or future delay or omission in the exercise of any right or remedy accruing to Lender as a result of any default is intended to constitute a waiver of any right or remedy accruing to Lender as a result of that default or any other default.

Payment to Lender in an amount less than the total delinquent sums should not be construed as an accord and satisfaction or as Lender's agreement to accept a lesser amount as payment in full of the delinquent sums. The Lender's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction. Lender may accept any such payment or check without prejudice to its rights to receive the balance of all amounts due under the Loan Documents or to pursue its remedies.

In addition, all of the Lender's claims, demands and accruals regarding the above-described indebtedness, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated.

Additionally, this letter shall constitute notice that Borrower is liable for all attorneys' fees, costs and expenses incurred by Lender in connection with the enforcement of Lender's rights and remedies under the Loan Documents and/or under applicable law.

Nothing contained in this letter nor in any other communications between Lender and Borrower shall be deemed to constitute or shall be construed as (i) a waiver or release of any of Lender's rights or remedies against Borrower, Guarantors or any other party to the Loan Documents or pursuant to applicable law, (ii) a course of dealing obligating Lender to provide any accommodations, financial or otherwise, to Borrower or Guarantors at any time, (iii) a waiver of any other default or Event of Default by Borrower or Guarantors under the Loan Documents or any other contract between the parties, or (iv) a commitment, or an agreement to make a commitment, with respect to any possible restructuring of the credit facilities provided in the Loan Agreement.

Should you have any questions, please call Todd Kristol at (212) 891-1547.

BA CHUB CAY, LLC, a Delaware limited liability company

By:    Styx Partners, L.P., a Delaware limited partnership, its managing member

      By:    Styx Associates LLC, a Delaware limited liability company, its general partner

         By: _____
         Name: _Mark Neporent_____
         Title: _Authorized Signatory_

cc:    Clifford Chance US LLP
     31 West 52nd Street
     New York, New York 10019
     Attention: Jay L. Bernstein, Esq.
     Facsimile: (212) 878-8375

     Scotia Bank (Bahamas) Limited
     Main Branch
     P. O. Box N 7518
     Nassau, Bahamas
     Attention: Dana Braynen and Edward Curry